YOUNG, J.
These consolidated appeals concern a tax exemption that aims to improve Michigan’s environment by encouraging entities to reduce air pollution they create in Michigan. Based on the plain language of the statute, we hold that in order to for equipment to be exempt, it must be installed or acquired for the primary purpose of regulating or curbing the spread of pollution in Michigan. Further, the equipment must actually and physically limit pollution. None of the equipment that is the subject of this appeal meets these tests. Therefore, the Court of Appeals erred by partially overturning the decision of the Department of Environmental Quality (DEQ) and the State Tax Commission (STC) to that effect and holding that petitioners’ test cells qualify for the exemption. We reverse the Court of Appeals in part and restore the DEQ and STC decisions concluding that none of the equipment qualifies for the tax exemption.
FACTS AND PROCEDURAL HISTORY
The material facts in these consolidated appeals are undisputed. Pursuant to federal law, before issuing a certificate allowing for sales of new vehicles, the Environmental Protection Agency (EPA) must “test or require to be tested” new motor vehicles or new motor vehicle engines to ensure compliance with emission standards that the EPA promulgates.[1] To that end, the agency has created a testing regime, requiring vehicle manufacturers to submit an application with an enormous amount of supporting data.[2] Ford Motor Company, DaimlerChrysler Corporation, and Detroit Diesel *223 (petitioners) installed test cells. The test cells are large buildings that can replicate many temperature conditions. They also house equipment that allows for up to 40 different types of tests and data collection.[3] Petitioners’ test cells are used in the manufacturing process to ensure compliance with the regulations. In addition to its test cell, Detroit Diesel installed a new engine production line to meet federal emissions regulations.
All the petitioners sought tax exemptions from the STC under part 59[4] of the Natural Resources and Environmental Protection Act (NREPA)[5] for their test cells, and Detroit Diesel also petitioned for an exemption for its engine line. Part 59 provides real and personal property tax exemptions, as well as sales and use tax exemptions for certain air pollution control facilities.[6] The law requires that the STC refer applications to the DEQ. The DEQ concluded that none of petitioners’ equipment qualified for an exemption under part 59 because its primary purpose was not to reduce pollution, but to test products for compliance with federal emissions standards and to manufacture engines that comply with *224 those standards. The DEQ also found that all the equipment actually generated some pollution during the testing or manufacturing processes, instead of physically disposing of air pollution or controlling it as the law requires. The STC agreed and denied all the exemptions. Petitioners appealed to various circuit courts. Ford’s four exemption denials were reversed, while denials for Daimler-Chrysler and Detroit Diesel were affirmed.
The Court of Appeals granted the appellate applications of all the aggrieved parties and consolidated the cases on appeal. Its published opinion held that tax exemptions must be issued for all petitioners’ test cells. The Court of Appeals concluded that the primary purpose of the test cells is to reduce pollution and that they need not physically or directly reduce pollution in order to qualify as tax-exempt. However, the Court of Appeals affirmed the denial of an exemption for Detroit Diesel’s engine manufacturing line on the ground that its primary purpose was engine manufacturing, not pollution reduction. The Court also held that no due process violation occurred during the STC’s consideration of Detroit Diesel’s application for a tax exemption.[7] This Court granted leave to appeal.[8]
STANDARD OF REVIEW
The Court reviews de novo motions for summary disposition.[9] Issues of statutory construction are also reviewed de novo.[10]
*225 analysis
The primary issue on appeal is whether the Court of Appeals erred in its application of the tax exemption of part 59 of NREPA. As noted, the Court of Appeals reached different conclusions for the petitioners’ test cells and Detroit Diesel’s engine line. With regard to the test cells, the Court held:
[I]t is plainly apparent to us that the test cells were “installed or acquired for the primary purpose of controlling or disposing of air pollution” and that the test cells were designed and are operated “primarily for the control, capture, and removal of pollutants from the air, and [are] suitable, reasonably adequate, and meet[] the intent and purposes of part 55 ... .”[11]
However, with regard to Detroit Diesel’s engine line, the Court reached the opposite conclusion, holding that “[c]learly, the engine line ... is not ‘operated primarily for the control, capture, and removal of pollutants from the air____’ ”[12]
While the Court of Appeals quoted language from the proper statutory provisions, the Court did not offer a construction of that language. Instead, the Court held that it was plain and clear which equipment was eligible and which was not. As will be discussed later, the statutory provisions provide no principled basis for distinguishing between the different equipment involved in this appeal. Under the plain language of these provisions, neither the test cells nor the engine line qualifies for the exemption.
MCL 324.5901 defines “facility,” in part, as
*226 machinery, equipment, structures, or any part or accessories of machinery, equipment, or structures, installed or acquired for the primary purpose of controlling or disposing of air pollution that if released would render the air harmful or inimical to the public health or to property within this state.
An exemption for a particular “facility” requires a determination by the DEQ that “the facility is designed and operated primarily for the control, capture, and removal of pollutants from the air, and is suitable, reasonably adequate, and meets the intent and purposes of part 55[13] and rules promulgated under that part.”[14]
Thus, the equipment must meet the requirements of both §§ 5901 and 5903 to qualify for the tax exemption. Section 590l’s definition of “facility” expressly requires that the equipment be “installed or acquired for the primary purpose of controlling or disposing of air pollution . . . .” “Control” means to “exercise restraint or direction over; dominate, regulate, or command; to hold in check; curb.”[15] “Dispose of” means “a. to deal with conclusively; settle, b. to get rid of; discard or destroy.”[16]
The primary purpose of this equipment is to build engines (Detroit Diesel) or test engines (petitioners’ test cells). The ancillary effect of the equipment is the control of pollution emitted by the engines. While the test cells help petitioners ensure that they are producing less polluting engines, the primary purpose of this equipment is not to regulate, curb the spread of, or destroy air pollution — and certainly not “pollution that *227 if released would render the air harmful... to the public health or to property within this state”[17] Instead, the primary purpose of the equipment is to test engines to ensure that petitioners have properly designed their engines to meet federal regulations so that they can sell them to consumers.[18] Furthermore, the equipment itself does not get rid of or curb air pollution. Thus, petitioners’ test cells are not “facilities” as defined by MCL 324.5901.
Even assuming that petitioners’ federally required pollution equipment and Detroit Diesel’s engine line qualify as “facilities,” petitioners are still not entitled to an exemption because none of the equipment qualifies under § 5903. Under that section, the DEQ must find “that the facility is designed and operated primarily for the control, capture, and removal of pollutants from the air.” There are a number of terms in this provision that need to be defined to properly construe it. The focus of *228 the section is on the “design” and the “operation” of the facility. “Design” means “to intend for a definite purpose,” while “operate” means “to work, perform, or function, as a machine does ... to bring about, effect, or produce, as by action or the exertion of force or influence.”[19] Thus, the facility must be intended to and bring about “the control, capture, and removal of pollutants from the air.” “Control” has already been defined. “Capture” means “to gain control of or exert influence over,” and “remove” means “to move or shift from a place or position; to eliminate; do away with or put an end to.”[20] Because the Legislature used the conjunction “and,” a qualifying facility must do all three things: curb, control, and eliminate pollution. Furthermore, the words suggest that the facility must actually and physically limit pollution. They do not stand for the proposition that the facility itself may contribute to the creation of a product that pollutes less than a similar product, which is what the equipment in this case does. Because the statutory language requires the facility to do the removing, controlling, and capturing of pollution, this equipment does not qualify.
The Court of Appeals held that the test cells qualified under § 5903 “because without the test cells, [petitioners] would not be able to ensure that their products are adequately controlling, capturing, and removing pollutants from the air as compared to earlier versions of their vehicles and engines.”[21] This observation misses the mark. The fact that the federal government may require such pollution control testing equipment has nothing to do with its eligibility for a tax exemption under Michigan law. The dissent makes a similar ana *229 lytic mistake, asserting that the test cells qualify because they “control” pollution “by regulating the emissions output” and “by curbing the levels of pollutants released into the air in the first place”; they “capture” pollution by “ensuring] that pollutants that would otherwise have been released into the atmosphere are never produced in the first place”; and they “remove” pollution “by preventing the pollutants from being created in the first place.”[22] The problem with both of these analyses is that the test cells, much like Detroit Diesel’s engine line, are not the source of the removal, control, or capture of pollution as required by the exemption. The testing process both produces and releases pollution contrary to the requirements of the statute. The design of the engine, and the engine alone once put into manufacture and sold in a vehicle, accomplishes the removal, control, and capture of pollution because such an engine produces less pollution than other models. Without the changes to the design of the engine, the test cells would accomplish nothing. Because the statutory language requires the facility to do the removing, controlling, and capturing, and the test cells and the pollution testing equipment in the engine plant do not remove, control, or capture pollutants, this equipment does not qualify for the tax exemption. Furthermore, none of the pollution control created by redesigned engines tested by petitioners is intended to improve the quality of Michigan’s air. This fact does not trouble the Court of Appeals or the dissent, which must presume that our Legislature intended a gift from Michigan taxpayers to the nation by advancing national, rather than local, air quality goals.
Moreover, the Court of Appeals opinion does not directly address the requirement that a facility must *230 “meet[] the intent and purposes of part 55” of NREPA.[23] A review of the other provisions in part 55 leaves little question that part 55 regulates the construction and operation of sources of air pollution, and part 55 itself defines “source” as “a stationary source.”[24] The dissent *231 attempts to overcome this fact by focusing on the definition of “air pollution control equipment,” MCL 324.5501(c), arguing that because that definition is arguably broad enough to encompass petitioners’ test cells, the test cells must fall within the “intent and purposes of part 55.” The dissent’s analysis of the definition of “air pollution control equipment” must occur in a vacuum to reach its conclusion.[25] The air pollution control equipment is only relevant to the control of pollution at “sources” and in “processes.” A “process” is defined as “an action, operation, or a series of actions or operations at a source that emits or has the potential to emit an air contaminant.” MCL 324.5501(p) (emphasis added). Therefore, the fact that, as the dissent argues, a test cell theoretically qualifies as “air pollution control equipment” is wholly irrelevant for purposes of part 55 because the test cell has no effect on air pollution at any source or in any process.
*232 Part 55 provides for permitting, monitoring to ensure compliance, reporting, and imposing sanctions for violations. Notably, emissions from vessels and motor vehicles are covered in parts 61, 63, and 65. The inescapable conclusion is that part 55 serves to regulate air pollution from stationary sources, while air pollution from mobile sources is covered by other parts of NREPA. Nothing about the test cells affects air pollution from a stationary source; in fact, as stated, a test cell itself adds contaminants to the air in its location. If reduction of vehicle emissions qualifies as meeting the purpose of part 55, then the vehicles themselves would also qualify. Likewise, any auto repair shop could claim as exempt any equipment it installed to test motor vehicle exhaust for excess pollution.
The Court of Appeals and the dissent simply fail to give meaning to part 55. In so doing, they have broadly construed this tax statute, contrary to the rule of construction that exemptions be narrowly construed against the taxpayer;[26] distorted the purpose of this tax statute; and awarded taxpayer money to business entities who fail to abate pollution in this state. In fact, the dissent actively conflates part 55 with the other parts of NREPA by concluding, “[a]s long as petitioners sell engines and vehicles in Michigan, thereby reducing harmful pollution in Michigan, the fact that they also sell engines and vehicles in other states, thereby reducing pollution in those states as well, does not prevent them from qualifying for the instant tax exemption.”[27]
The two published opinions interpreting this part of NREPA support the conclusion that the exemption does not apply to petitioners’ equipment. In Meijer, Inc v *233 State Tax Comm,[28] the Court of Appeals held that a trash compactor and baler, which Meijer installed to replace an incinerator that polluted the air when burning trash from Meijer’s grocery stores, was eligible for the tax exemption under MCL 336.1 (the predecessor to MCL 324.5901). In the second case, Covert Twp Assessor v State Tax Comm [29] this Court upheld the STC’s grant of a tax exemption to Consumers Power Company for a nuclear containment building at its nuclear power plant. Both of these cases concerned sources of pollution that would have been subject to the regulatory statutes of part 55.
This Court’s decision in Covert interpreted “primary purpose” to mean “the primary purpose served by the facility for which [the] exemption is sought.”[30] While the equipment in Covert was installed pursuant to federal law, this Court stated that the “purpose served” need not “align with the motivation of” those installing the facilities.[31] Nonetheless, the statute requires that the primary purpose be the control or disposal of air pollution. The equipment in Covert was installed to prevent the release of hazardous materials in the event of an accident at the petitioner’s nuclear facility in this state. Therefore, the primary purpose was the control of air pollution in the event of an accident. That primary purpose qualified the equipment for the tax exemption.
Similarly, the “facility” in Meijer, a compactor and baler, actually served the primary purpose of controlling pollution in Michigan. The Meijer petitioner installed the compactor and baler to replace its incinerator because the incinerator produced pollution in excess of *234 the amount allowed under the law. The compactor and baler accomplished the same task as the incinerator while producing less pollution.[32]
Contrary to the Court of Appeals conclusion, the test cells are not analogous to the compactor and baler because the test cells did not replace a more polluting testing process. As noted by the Meijer panel, “had no pollution problem existed, and appellee simply chose the method of waste disposal by compacting and baling in order to dispose of waste, it would be ineligible for tax exemption because the necessary element — primary pollution control purposes — would be lacking.”[33] The facilities in the instant case were installed for the primary purpose of testing engines, which will theoretically produce less pollution than other engines once put into production. However, petitioners simply chose a method of testing. They did not install the test cells to replace a process that accomplishes the same task with more pollution. Thus, the Court of Appeals and the dissent erroneously relied on Meijer to conclude that ancillary equipment installed primarily for the purpose of testing other equipment also qualifies for the exemption.
*235 The clear import of these cases and the statute is that the “facility” must reduce the air pollution caused by the operation of the petitioner’s Michigan site to qualify for the tax exemption. However, the dissent argues that the reduction of air pollution caused by the petitioner’s engine products — well after those products have left the petitioner’s control — can qualify the testing equipment used to manufacture those products for the exemption. This interpretation expands the exemption statute far beyond its plain meaning and contrary to any rationale that our Legislature entertained for affecting this state’s environment.
CONCLUSION
In denying DaimlerChrysler’s application for its Auburn Hills test cell, the DEQ listed the following “Non-Air Pollution Function(s) of Equipment”: “The testing of vehicles is one of the manufacturing steps that the applicant takes in researching, designing, manufacturing, testing, marketing and selling vehicles.”[34] In the “comments” section, the DEQ states:
Testing vehicles at the Chrysler Technical Center actually generates and emits air contaminants. None of the requested equipment controls, capture [sic] or removes pollutants generated by the vehicle testing equipment. The applicant has not satisfied its burden of establishing that its described machinery, equipment, structures, or related accessories were installed or acquired and designed and operated to physically control, dispose, capture, and/or remove air pollutants from the air, that if released would render the air harmful, pursuant to the intent of Sections 5901 and 5903 of Part 59, as separate and distinct from apparent other purposes of measuring, recording and assessing data to determine if a product is fit for continued *236 production or commercial sales, or for other research, manufacturing, marketing or sales purposes. The Department finds that the applicant has not established a primary purpose qualifying for a tax exemption under Part 59.[35]
The DEQ properly applied §§ 5901 and 5903 and concluded that the test cells do not qualify for a tax exemption. Therefore, we reverse the Court of Appeals and reinstate the STC’s decision denying petitioners’ request for tax exemptions for their test cells. However, we affirm the Court of Appeals holding that the Detroit Diesel Equinox Line was not entitled to a tax exemption and that Detroit Diesel received due process.
Taylor, C.J., and Cavanagh, J., concurred with Young, J.

 42 USC 7525(a)(1) and 7521.

 See 40 CFR 86.1 et seq.

 Narrative Statement attached to DaimlerChrysler Auburn Hills Application for Tax Exemption Certificate, July 14, 2003, pp 5-11. The Auburn Hills DaimlerChrysler test cell is similar to the test cells of the other petitioners. The individual specifications of each test cell do not control the disposition of this case. Therefore, this Auburn Hills DaimlerChrysler test cell summary can serve as a general example for purposes of analysis.

 MCL 324.5901 et seq.

 MCL 324.101 et seq.

 Ford had previously applied for and received a tax exemption under part 59 for its Allen Park test cell facility in 2001. While the applications involved in the instant action were pending in 2004, DEQ notified Ford that it was requesting revocation of its exemption for the Allen Park facility because the facility did not meet the requirements of part 59. The STC rejected the revocation, though, concluding that an exemption certificate under part 59 cannot he revoked. That exemption dispute is not before the Court.

 We agree with the Court of Appeals that the full hearing conducted by the STC satisfied Detroit Diesel’s due process rights.

 480 Mich 880 (2007).

 Spiek v Dep’t of Transportation, 456 Mich 331, 337; 572 NW2d 201 (1998).

 City of Taylor v Detroit Edison Co, 475 Mich 109, 115; 715 NW2d 28 (2006).

 Ford Motor Co v State Tax Comm, 274 Mich App 108, 113; 732 NW2d 591 (2007) (alterations in Ford Motor).

 Id. at 118.

 MCL 324.5501 et seq.

 MCL 324.5903 (emphasis added).

 Webster’s Universal College Dictionary (1997).

 Random House Webster’s College Dictionary (1997).

 MCL 324.5901 (emphasis added). The dissent is correct that the statute does not require that the equipment “solely” control pollution in Michigan. However, this equipment does not control any pollution in Michigan. It is the engines and vehicles tested that emit less pollution. While those vehicles may be sold in Michigan and may emit less pollution than other vehicles sold in Michigan, the test cells and Detroit Diesel’s engine plant do not control any pollution in Michigan or any other state.

 The dissent misconstrues this statement to argue that this interpretation would render any equipment required by a federal regulation ineligible for the exemption. Regardless of whether the federal government requires the installation of the pollution testing equipment, it is not a “facility” under this statute unless its primary purpose is pollution control or disposal. For example, in Covert Twp v State Tax Comm, 407 Mich 561; 287 NW2d 895 (1980), federal law required that the petitioner install a containment device at its nuclear facility. That equipment still qualified under the statute at issue because its primary purpose was to control pollution at the site in the case of an accident at the nuclear facility. The primary purpose of the test cells and Detroit Diesel’s engine plant is not control or disposal of pollution. Therefore, regardless of whether federal law or “philanthropy” motivated petitioners to install the test cells or the engine plant, they do not qualify for the exemption.

 Random. House Webster’s College Dictionary (1997).

 Id.

 Ford Motor, supra at 114 (emphasis added).

 Post at 255.

 The dissent asserts that the purpose of that part is the prevention and abatement of air pollution. In addition to being overly simplistic, this interpretation, when applied to MCL 324.5903, violates the rule of statutory construction that the Court should not interpret a statute in a way that renders part of it nugatory or mere surplusage. Grimes v Dep’t of Transportation, 475 Mich 72, 89; 715 NW2d 275 (2006). MCL 324.5903 provides: “If the department finds that the facility is designed and operated primarily for the control, capture, and removal of pollutants from the air, and is suitable, reasonably adequate, and meets the intent and purposes of part 55 and rules promulgated under that part, the department shall notify the state tax commission, which shall issue a certificate.” Thus, the statute requires that the “facility” control, capture, and remove pollutants and meet the intent and purposes of part 55. If the dissent is correct that the “intent and purposes” of part 55 are simply the reduction of pollution, then that requirement adds nothing to the first requirement. However, our interpretation that the “intent and purposes” of part 55 are the reduction of pollution at stationary sources adds something to the first requirement, namely a specific source of pollution that is to be targeted.

 MCL 324.5501(t). The dissent decries our effort to ascertain the intent and purposes of part 55 by considering the whole of part 55. The dissent would prefer to look at one sentence of § 5540 of part 55 that supports the dissent’s result to ascertain the intent and purposes of part 55.
The entirety of § 5540 is:
It is the purpose of this part to provide additional and cumulative remedies to prevent and abate air pollution. This part does not abridge or alter rights of action or remedies now or hereafter existing. This part or anything done by virtue of this part shall not be construed as estopping persons from the exercise of their respective rights to suppress nuisances or to prevent or abate air pollution. [MCL 324.5540.]
The clear import of this section is that part 55 provides additional remedies to the existing remedies for the prevention or control of air pollution, namely private nuisance suits or citizen suits under MCL *231 324.1701. This section does not stand for the idea that the intent and purposes of part 55 are to control air pollution in all its forms and from any source, as the dissent asserts.
The dissent misconstrues the import of this discussion of § 5540. Unlike the dissent, we do not believe that the “intent and purposes” of part 55 are contained solely in § 5540. Instead, as noted, we believe that the entirety of part 55 should be considered to determine its “intent and purposes.” Therefore, we think it is unnecessary “to explain how pollution-control facilities other than the test cells can provide ‘additional remedies’ that the test cells cannot.” Post at 258.

 Similarly, the dissent has chosen the one subsection of MCL 324.5512(1) that references “models] of transportation” to bolster its conclusion that the test cells meet the intent and purposes of part 55. Unfortunately, most of the subsections of MCL 324.5512(1) deal with “stationary sources” in accordance with the “intent and purposes” of part 55. We are uncertain why the Legislature decided to confer rulemaking authority with regard to modes of transportation in part 55; however, we do not believe that this one subsection alters the fact that the “intent and purposes of part 55 and rules promulgated under that part” are to regulate air pollution from stationary sources. See Mich Admin Code, R 336.1101 et seq.

 See Wexford Medical Group v City of Cadillac, 474 Mich 192, 207; 713 NW2d 734 (2006), and post at 248.

 Post at 253 n 15.

 66 Mich App 280; 238 NW2d 582 (1975).

 407 Mich 561; 287 NW2d 895 (1980).

 Id. at 580.

 Id. at 580-581.

 The dissent argues that under our interpretation of MCL 324.5901, the compactor and baler would not qualify as a facility because the equipment simply compresses or bales material. This argument misconstrues both our interpretation and the facts of Meijer. The Meijer petitioner had been disposing of its refuse with an incinerator that produced an abundance of pollution. As noted, the petitioner installed the compactor and baler for the primary purpose of controlling the air pollution produced by its refuse disposal system. Furthermore, when the compactor and baler were operated they actually “controlled, captured, and removed” pollutants at that site. The test cells simply do not perform these functions. Any reduction of pollution that is connected to the test cells is entirely contingent on the redesign and manufacture of the engines and vehicles that may be introduced for future sales across the country.

 Meijer, supra at 285.

 DEQ Tax Exemption Review, December 15, 2003. The DEQ reached the same conclusion with regard to the other petitioners’ test cells.

 Id.