MARKMAN, J.
(dissenting). Because I disagree with the majority interpretation of the statute in controversy, MCL 418.315, I respectfully dissent.[1]
I. BACKGROUND
Plaintiff, a truck driver, fell off his truck and injured his back while working. He sought workers’ compensation benefits under the Worker’s Disability Compensation *351 Act (WDCA), MCL 418.101 et seq. The magistrate granted benefits and medical costs to plaintiff, and also imposed $46,034 against defendants for plaintiffs attorney fees pursuant to MCL 418.315(1).[2] The Workers’ Compensation Appellate Commission (WCAC) affirmed.
The Court of Appeals initially denied leave to appeal, but this Court remanded for consideration as on leave granted on the division of defendants’ liabilities and the assessment of attorney fees. 477 Mich 871 (2006). On remand, the Court of Appeals affirmed the WCAC’s imposition of liability against certain defendants, and that issue is not the subject of this appeal. The Court of Appeals also affirmed the WCAC’s assessment of attorney fees against defendants. Unpublished opinion per curiam of the Court of Appeals, issued April 17,2008 (Docket Nos. 273293 and 273294). The majority determined that attorney fees could be imposed on employers and their insurers under § 315(1), while Judge ZAHRA, in dissent, concluded that § 315(1) did not allow such imposition. This Court granted leave to appeal to consider the meaning of § 315(1), 482 Mich 994 (2008), and now affirms the Court of Appeals. Because I believe the Court of Appeals dissent is correct, I dissent.
II. STANDARD OF REVIEW
Questions of statutory interpretation are reviewed de novo. Brackett v Focus Hope, Inc, 482 Mich 269, 275; 753 NW2d 207 (2008).
III. STATUTE
MCL 418.315(1) provides, in part:
*352 The employer shall furnish, or cause to be furnished, to an employee who receives a personal injury arising out of and in the course of employment, reasonable medical, surgical, and hospital services and medicines, or other attendance or treatment recognized by the laws of this state as legal, when they are needed . .. The employer shall also supply to the injured employee dental service, crutches, artificial limbs, eyes, teeth, eyeglasses, hearing apparatus, and other appliances necessary to cure, so far as reasonably possible, and relieve from the effects of the injury. If the employer fails, neglects, or refuses so to do, the employee shall be reimbursed for the reasonable expense paid by the employee, or payment may be made in behalf of the employee to persons to whom the unpaid expenses may be owing, by order of the worker’s compensation magistrate.[3] The worker’s compensation magistrate may prorate attorney fees at the contingent fee rate paid by the employee.
The instant dispute centers on the meaning of the final sentence, specifically what it means for the magistrate to be allowed to “prorate attorney fees.” Plaintiff contends, and a majority of this Court agrees, that this sentence allows a magistrate, when granting a recovery under the penultimate sentence, to order the employer to pay, in addition to the amount awarded for reimbursement of unpaid medical expenses, the employee’s attorney fees attributable to the unpaid benefits.[3]
[4] Defendants, however, argue that the final sentence allows *353 a magistrate, when ordering an employer to pay unpaid medical expenses to “persons to whom the unpaid expenses may be owing,” to deduct a proportionate share from those payments for the employee’s attorney fees.[5]
The primary goal of statutory interpretation is to discern and give effect to the Legislature’s intent. Neal v Wilkes, 470 Mich 661, 665; 685 NW2d 648 (2004). A court first looks at the statute’s language, Brown v Detroit Mayor, 478 Mich 589, 593; 734 NW2d 514 (2007), from which “the Legislature’s intent must be gathered,” Frankenmuth Mut Ins Co v Marlette Homes, Inc, 456 Mich 511, 515; 573 NW2d 611 (1998) (quotation marks omitted). When reviewing the statute, “[a]ll words and phrases shall be construed and understood according to the common and approved usage of the language,” MCL 8.3a, and “a word or phrase is given meaning by its context or setting,”[6] Koontz v Ameritech Services, Inc, 466 Mich 304, 318; 645 NW2d 34 (2002).
I agree with the Court of Appeals dissent, and with defendants, that the better interpretation of § 315(l)’s final sentence is that a magistrate can apportion an amount of the employee’s attorney fees from an employer’s payment to the medical care providers. This interpretation rests principally on the meaning of “prorate,” which means “to divide, distribute, or calculate proportionately.” Random House Webster’s College Dictionary (1997). Thus, the final sentence can be read to allow the *354 magistrate to either divide or distribute proportionately attorney fees. That the division or distribution must be proportionate necessarily implies that there must be some basis, or rational calculation, upon which the total amount of attorney fees can be divided or distributed. This basis becomes increasingly apparent when § 315(l)’s final sentence is considered with the previous sentence, in which the magistrate is directed to order the employer to make “payment... in behalf of the employee to persons to whom the unpaid expenses may be owing.” Thus, payments will be made to medical providers in the amount of the unpaid expenses owed by the employee. These payments logically supply the basis upon which the attorney fees can be proportionately divided, because each payment constitutes a portion of the whole on which the employee’s attorney fees are calculated.[7] That is, if the magistrate orders payment to multiple medical providers, then a share of the employee’s attorney fees is deducted from each payment based on the proportion of the whole that each payment represents.
The Legislature’s use of the word “may” to confer upon the magistrate the authority to “prorate attorney fees” lends further support to this interpretation. By this word choice, the Legislature has indicated that there are times when a magistrate might not “prorate attorney fees.” If “prorate” is interpreted to allow a division of fees between medical care providers, then the use of “may” in this context makes sense. In those *355 instances that the magistrate directs payment to the medical providers, the magistrate would divide the fees, but when the magistrate only ordered reimbursement to the employee for his or her “reasonable expenses paid,” the magistrate would not divide the fees. Thus, the final sentence recognizes that under the penultimate sentence the magistrate may direct payment either to the employee, in which case the division of attorney fees would be inappropriate, or the magistrate may direct payment to multiple medical care providers, or to the employee and medical care providers, in which case division of the attorney fees would be appropriate.
By contrast, the majority interpretation of § 315(l)’s final sentence allows a magistrate to impose attorney fees against the employer, in addition to the payment for unpaid medical expenses, with utterly no direction concerning the circumstances in which the magistrate should do so. That is, the majority interpretation accords the magistrate the discretion to assess attorney fees against an employer when the employer “fails, neglects, or refuses” to pay benefits, but provides no guidance for ascertaining when that discretion should or should not be exercised. Had the Legislature truly intended for the magistrate to impose attorney fees against an employer, it seems likely that the Legislature would have included some standard for determining the circumstances under which fees should be assessed.[8]
*356 Even more troubling is that the Chief Justice apparently finds the entire final sentence of § 315(1) irrelevant in concluding that a magistrate can impose attorney fees against an employer. She states:
[T]he word “may” bears on whether a proration must occur if a magistrate does award attorney fees.... Should a magistrate determine that only one [party] is liable, the magistrate may impose attorney fees against only that party Conversely, should the magistrate find multiple parties liable, fees may be prorated accordingly. [Ante at 310.]
Thus, the Chief Justice interprets § 315(1) to' allow a magistrate to impose attorney fees absent any “proration” of the fees because she interprets “may” as according the magistrate the discretion to decide “whether a proration must occur,” after he has already decided to award attorney fees. If the magistrate determines that the attorney fees should be imposed on “multiple parties,” then the magistrate can “prorate” or divide the fees among those parties. However, if “only one [party] is hable,” the magistrate can impose the fees “against only that party” without having to “prorate” or divide the fees at all. This completely fails to recognize that § 315(1) only allows the magistrate to “prorate” or not “prorate” attorney fees. Interpreting § 315(1) to allow the magistrate to impose attorney fees without relying on the specific authority to “prorate” reads an authorization into the statute that clearly does not exist.
The Chief Justice supports her interpretation by reasoning that because the “statute . . . provides a process for employers and their insurance carriers to object to the medical treatment that an injured employee seeks,” the final sentence “when read with the remainder of the statute, applies to the parties who might contest the payment of medical benefits: employers and their insurance carriers.” Ante at 309. That is, to *357 “harmonized the final sentence with the remainder of § 315,” and to avoid the final sentence “standing] alone,” § 315(l)’s final sentence must be read to impose additional liability on employers and their insurers, in order to maintain a “unity of purpose.” Ante at 308-309, 336; see also ante at 342 (HATHAWAY, J., concurring). Contradicting this pursuit of “harmony” and “unity,” however, are fundamental differences between § 315(l)’s final sentence and the preceding sentences, which clearly establish an employer’s liability for particular expenses. In these preceding sentences, the Legislature states that the employer “shall furnish, or cause to be furnished,” various reasonable medical expenses and that the employer “shall also supply” various correctional devices (e.g., eyeglasses, artificial limbs, crutches). MCL 418.315(1). If the employee pays these reasonable expenses, then under the penultimate sentence the employee “shall be reimbursed” for the reasonable expense paid by the employee. Id. Thus, the penultimate sentence relates back to the listed expenses that an employer “shall” pay. Attorney fees are not included in those expenses; yet the majority interpretation effectively gives the phrase “may prorate” the same meaning as the phrases “shall furnish” and “shall supply” so that the final sentence imposes an additional payment obligation upon the employer. This conclusion is contrary to the logical assumption that, had the Legislature intended to affirmatively impose payment of attorney fees upon an employer, it would have done so with at least approximately the same clarity with which it imposed liability for other expenses upon the employer earlier within the same subsection.[9] Instead, the Legis *358 lature chose to use considerably different language in the final sentence than in the immediately preceding sentences.[10]
The final sentence is much better read, in my judgment, as an adjunct to the magistrate’s ability to direct payment to medical providers established in the penultimate sentence. The legislative amendment adding the final sentence to § 315(1) specifically supports such a relationship. Before this amendment, the then-final sentence of former MCL 412.4, which is now § 315(l)’s penultimate sentence, only allowed the employee to receive payment for medical expenses:
If the employer shall fail, neglect or refuse so to do, such employee shall be reimbursed for the reasonable expense incurred by or on his behalf in providing the same, by an award of the commission. [MCL 412.4, as amended by 1955 PA 250.]
When the Legislature amended the statute to allow payment to also be directed to the medical providers, it added the now-final sentence in dispute here:
If the employer shall fail, neglect or refuse so to do, such employee shall be reimbursed for the reasonable expense paid by' him, or payment may be made in behalf of such employee to persons to whom such unpaid expenses may be owing, by an award of the commission. The commission may prorate attorney fees in such cases at the contingent fee rate paid by such employee and it may also prorate such payments in the event of redemptions. [MCL 412.4, as amended by 1963 PA 199.]
*359 Thus, the magistrate’s ability to “prorate attorney fees” directly accompanied the magistrate’s ability to direct payments to medical providers.[11] This association seems to indicate that the Legislature recognized that when medical providers received payment from the employer, the medical providers themselves could fairly be said to have been enriched by the work of the employee’s attorney.
Prior to the amendment, a medical provider was relegated to seeking payment from the employee through a separate cause of action. Even if the medical providers recovered the full amount in the action, each would still have to pay its own attorney costs due to the longstanding “American Rule” regarding attorney fees.[12] In effect, the Legislature set forth a shortcut to *360 this practice in § 315(1). Rather than requiring medical providers to hire their own attorneys and commence separate actions against the employee, § 315(1) now allows the medical provider to recover through the action instituted by the employee.[13] Medical providers receive the same reimbursement amount as they did before the amendment, while employees retain more of the recovery to which they are entitled.[14]
*361 The majority interpretation would impose an additional cost upon the workers’ compensation process by penalizing employers and forcing them to pay not only for their own attorneys, but also for their employees’ attorneys. This increased expense is at odds with MCL 418.801(3), in which the Legislature has already provided a penalty for unpaid medical benefits:
If medical bills or travel allowance are not paid within 30 days after the carrier has received notice of nonpayment by certified mail, in cases where there is no ongoing dispute, $50.00 or the amount of the bill due, whichever is less, shall be added and paid to the worker for each day over 30 days in which the medical bills or travel allowance are not paid. Not more than $1,500.00 in total may be added pursuant to this subsection.
The majority interpretation would establish a new penalty provision with § 315(l)’s final sentence that is *362 inconsistent with the WDCA’s actual penalty provision, in which the Legislature expressly provides for a penalty payment only “where there is no ongoing dispute.” Nothing in the majority interpretation prevents the attorney-fees penalty from operating even in the presence of a dispute, which is directly contrary to when the Legislature has stated a penalty should apply. If the Legislature intended § 315(1) to operate as a penalty provision, then it would seem that such penalty would at least be assessed consistently with the penalty provided under § 801(3). This lack of consistency casts further doubt on the majority interpretation.
With respect to the magistrate’s authority over medical providers that are not parties to the action, § 315(2) implies that the magistrate indeed does have authority over medical providers when they are operating in the context of § 315 by providing that any recovery by a medical provider can be reduced by the magistrate to the “maximum charge established under the rules.” (Emphasis added.) Thus, the magistrate may reduce the provider’s recovery even if the provider is not a party to the action. It follows that the magistrate has the same ability to reduce the recovery to pay for an employee’s attorney fees when the statute grants the magistrate such authority in § 315(1).[15]
*363 In conclusion, several clues supplied by § 315(1) and the WDCA support the interpretation set forth in this dissent. Particularly relevant in this regard are: (1) the use of “prorate,” the proportionality of the division this term conveys, and the fact that there is some logical standard or basis for calculating proportions under this interpretation, but not under the majority interpretation; (2) the use of “may” in describing the magistrate’s authority to prorate, and the fact that there is some logical standard or basis for exercising this authority under this interpretation, but not under the majority interpretation; (3) the consistency of this interpretation, and the lack of consistency of the majority interpretation, with the penalty provision in § 801(3); (4) the fact that the majority interpretation reads words into § 315(1) that are absent and nullifies words that are present; (5) the significant differences in language between the introductory sentences of § 315(1), which clearly establish an employer’s liability for particular expenses, and its final sentence, which does nothing equivalent; (6) the logical implications drawn from § 315(l)’s final sentence being positioned after the penultimate sentence, and the legislative amendment of § 315(1); and (7) the similarity in the arrangement between employees’ attorneys and medical providers *364 set forth in this dissent and the arrangement between employees’ attorneys and nonparties set forth in §§ 821 and 827.
IV RESPONSE TO THE CHIEF JUSTICE
Not content with merely misconstruing the law, the Chief Justice adopts an approach to statutory interpretation that can only be described as bizarre. She begins her interpretation by asserting that the “threshold question is whether . . . the last sentence of § 315(1) is ambiguous.” Ante at 308.[16] After an entirely gratuitous citation to the dictionary definition of “prorate,” one that promptly proves to be irrelevant to any subsequent analysis, the Chief Justice determines that “the term ‘prorate’ could reasonably apply to employers, their insurance carriers, health care providers, employees seeking workers’ compensation benefits, or to any combination of them.” Ante at 308. This finding should come as no surprise considering the Chief Justice’s focus on the word “prorate” without regard to its context. Next, the Chief Justice initially determines that “neither § 315 as a whole nor any other provision of the WDCA indicates the parties to whom a division or distribution of attorney fees applies,” but nevertheless proceeds to adopt her own interpretation because it “unifies the last sentence of § 315(1) with the remainder of the statute.” Ante at 308-309. Satisfied that her interpretation also gives effect to the word “may,” cf. supra at 356, the Chief Justice then concludes that her interpretation “affords the phrase ‘may prorate’ its full meaning.” Ante at 310. After all of this, the Chief Justice continues to answer her “threshold question” in the affirmative, concluding that the statute is ambiguous *365 because other “interpretations of § 315(1) exist.” Ante at 310. That is, rather than even giving the appearance that she has reached the conclusion that the statute is “ambiguous” based upon her difficulty in ascertaining its meaning, the Chief Justice withdraws from the process of statutory interpretation once other interpretations are presented. It is apparently much easier to summarily declare “ambiguity,” and thereby avoid the inconvenience of having to actually carry out one’s judicial duties by deciding what the statute or contract actually states.[17]
a. ambiguity
As evident from her “interpretation” here, the Chief Justice’s dependence on an extraordinarily low threshold for finding ambiguity, and her resultant conclusion that § 315(1) is, of course, “ambiguous,” are essential to her analysis. The Chief Justice then proceeds on the assumption that, once ambiguity has been established, a judge is essentially unencumbered by any serious restraints imposed by the language of a statute or contract and effectively has carte blanche to utilize whatever factors are deemed appropriate in reaching a result.
I disagree with this approach to “interpretation,” not merely because it divorces the interpretative process from the law that is purportedly being “interpreted,” but also because it raises the unavoidable suspicion that *366 a judge is reaching the result he or she would personally prefer rather than the result compelled by the law. That is, instead of abiding by the traditional exercise of the “judicial power” in which the judge, employing the statute or contract itself as the lodestar, says only what the law “is,” the Chief Justice by her understanding of ambiguity would effectively exercise the “legislative power” to say what the law “ought to be” by arbitrarily picking and choosing among a practically limitless variety of available extra-textual considerations.[18] For the Chief Justice, the concept of ambiguity is one to be both casually and peremptorily invoked — as in this case in which no party has even asserted that the statute is ambiguous — to avoid the discipline of the traditional judicial process, while maintaining at least some appearance that this process has been respected. The lower the barrier to finding ambiguity, the more effortlessly a judge can dispense with the hard work of giving meaning to difficult and complex provisions of statutes and contracts, and the less risk that this regular process of interpretation will lead to the “wrong” results. A facile resort to ambiguity affords the judge a readily available means of acting beyond the scope of his or her authority to exercise exclusively the “judicial power.”
It is hard to conceive of a much lower barrier to ambiguity than that propounded by the Chief Justice. A statute, we are instructed, is “ambiguous” when it is “capable of being understood by reasonably well- *367 informed persons in two or more different senses.”[19] Ante at 331. If this definition does not describe almost all litigation coming before this Court, it certainly describes much of this litigation. There are relatively few appellate litigants — most of whom have undertaken the financial burdens of litigation, accepted the psychological and emotional tolls of a protracted legal process, and endured trial, intermediate appeal, Supreme Court appeal, remands, and motions for reconsideration, all while being represented by attorneys who are ethically obligated to ensure some degree of meritoriousness in their clients’ legal positions — whose statutory and contractual disputes could not be fairly characterized under the Chief Justice’s definition as entailing ambiguity. Indeed, little would be clearly excluded from the realm of ambiguity by her definition other than genuinely frivolous lawsuits, which are both rare and sanction-able. Matters of interpretation are resolved in judicial venues precisely because statutes and contracts are *368 susceptible to “being understood by reasonably well-informed persons in two or more different senses.”
Even more remarkable, however, is that the Chief Justice’s own “analysis” in this case does not even satisfy her own low threshold for discerning ambiguity, since there is nothing therein that suggests that either the plaintiffs or the defendants’ position is “reasonable.” In fact, the Chief Justice never once compares any interpretation other than her own to the statute. She simply notes the “existence]” of competing interpretations and declares ambiguity. Ante at 310. Essentially, the Chief Justice’s standard for discerning ambiguity is more accurately stated as: “A statute is ambiguous when parties offer conflicting interpretations.”[20]
The Chief Justice has previously observed, “I find frequent ambiguity in statutory language.” Haynes v Neshewat, 477 Mich 29, 40; 729 NW2d 488 (2007) (KELLY, J., concurring).[21] This is not surprising. For once *369 a statute or contract has been deemed “ambiguous,” this Court “may go beyond the plain language of the statute [or contract],” ante at 307-308, and then employ decision-making factors that would ordinarily be unavailable in the interpretative process. There is no lack of variety in these newly available factors. As I offered in my concurring opinion in Haynes:
Having reached the proper result in this case through a proper legal analysis, Justice Kelly in a concurrence to her own majority opinion proceeds to demonstrate that she *370 could have reached the same result through less disciplined means. Not content to rely, as she does in her majority opinion, on the actual language of the law, Justice KELLY invokes an array of alternative techniques to “interpret” the law in her concurring opinion. She relies upon a “liberal construction” of the statute in question; she relies upon characterizations of the statute as “broad” and “remedial”; she relies upon a summary description of the law as “ambiguous,” therefore apparently affording her the discretion to pick and choose the law she prefers; she relies upon the Legislature’s inaction in the wake of an earlier court decision, equating this to approval of the Court’s decision; she disparages the value of dictionaries as an essential tool in the interpretative process; and she relies upon an extraordinarily broad understanding of “legislative history.” For the sake of future reference, a further catalogue of language-avoidance “interpretative” techniques would include the following: divining the “spirit of a statute”; relying upon considerations of “public policy”; standardlessly applying “equity”; characterizing statutes with which a judge disagrees as “absurd”; and concocting creative “balancing” and “totality of circumstances” tests. Innovatively applied, each of these techniques can be relied upon to avoid the hard task of having to discern a statute’s meaning from its actual language. [Haynes, 477 Mich at 48-49 (Markman, J., concurring).]
The use of these and other factors to reach a decision far more closely resembles the exercise of the constitution’s “legislative power” than its “judicial power.” It is an undisciplined and standardless approach to giving meaning to the law, enabling the judge at his or her discretion to determine which factors to take into account, and what priority to give those factors.[22] It is *371 an approach that disrespects the separation of powers[23] and that enhances the power of judges at the expense of the rule of law.[24]
B. DISSENT AND AMBIGUITY
The Chief Justice’s definition of ambiguity stands in contrast to what has been the predominant approach in our state. In Mayor of Lansing v Pub Service Comm, 470 Mich 154, 166; 680 NW2d 840 (2004), this Court stated that “a provision of the law is ambiguous only if it ‘irreconcilably conflict[s]’ with another provision or when it is equally susceptible to more than a single meaning.” (Citation omitted.) Similarly, in Klapp v United Ins Group Agency, Inc, 468 Mich 459, 467; 663 NW2d 447 (2003), this Court found a contract to be ambiguous because two provisions “irreconcilably conflict[ed]” with each other.[25] Such an understanding of ambiguity restricts the judge *372 to saying what the law “is” based on the words chosen by the Legislature in all but the most extraordinary circumstances. While the Chief Justice suggests that the relative rarity of a finding that a law or contract is ambiguous under this definition constitutes its vice, ante at 322-323, by preserving a broader realm within which the ordinary process of interpretation may proceed, and in which deference will be shown to the decisions of the lawmaker, this may be better understood as its principal virtue.
Many disputes before this Court involve difficult or complex interpretations of statutes and contracts, yet it remains our responsibility to sort out these difficulties and complexities and finally determine what constitutes the most reasonable, if not always the perfect or the crystalline, meaning of the law. Judges have traditionally approached this responsibility by looking to the language of a statute or contract, considering relevant dictionary definitions of words and phrases,[26] assessing the existence and meanings of “terms of art,”[27] evaluating the context of words[28] and grammatical, syntactical, and punctuational clues,[29] comparing related and companion provisions of the law,[30] discerning the organization *373 and structure of statutes and contracts,[31] invoking traditional default rules and maxims of interpretation,[32] and applying proper understandings of legal purpose and precedent.[33]
This should not be understood as a mechanical process, for judges engaged conscientiously in this exercise will sometimes disagree about the meaning of the law, but it is a process in which the focus is directed outwardly toward the language of the statute or contract, rather than inwardly toward the personal predilections of the judge.[34] As Justice Felix Frankfurter once *374 remarked, “the highest exercise of judicial duty is to subordinate one’s personal will and one’s private views to the law.”
C. PREMISES OF AMBIGUITY RULE
Despite the Chief Justice’s view that an understanding of ambiguity does not constitute “binding precedent,” she nonetheless undertakes a strenuous effort to identify precedents in support of her position, while *375 undertaking no discernible effort to actually justify her own understanding. Rather than constituting an “aberrant” approach to interpretation, ante at 328 n 66, Mayor of Lansing and Klapp set forth a rule of statutory interpretation that, as with most other such rules, is grounded in logic and common sense, and is designed to faithfully ascertain the intentions of the Legislature. The understanding of ambiguity articulated in Mayor of Lansing and Klapp is premised upon longstanding principles of sound constitutional government that are suggested by the following inquiries directed toward those who would advocate a broader understanding:
—-When ambiguity is discerned, ordinary rules of interpretation no longer apply — as the Chief Justice asserts, a court may then “go beyond the plain language of a statute [or contract]” — and judges are accorded broad and arbitrary discretion to pick and choose from among a wide variety of factors as to how the law should be given meaning. Why would any responsible legal system wish to depart from its ordinary processes, from ordinary rules of interpretation and traditional exercises of the judicial power, with any greater frequency than is absolutely required?
—When ambiguity is discerned, ordinary rules of interpretation no longer apply — as the Chief Justice asserts, a court may then “go beyond the plain language of a statute [or contract]” — and judges are accorded broad and arbitrary discretion to pick and choose from among a wide variety of factors as to how the law should be given meaning. Why would any responsible legal system wish to replace a reasonably predictable rule of law with arbitrary, and possibly idiosyncratic, determinations of judges any more often than is absolutely required?
—-When ambiguity is discerned, ordinary rules of interpretation no longer apply — as the Chief Justice asserts, a court may then “go beyond the plain language of a statute [or contract]” — and judges are accorded broad and arbitrary discretion to pick and choose from among a wide *376 variety of factors as to how the law should be given meaning. Why would any responsible legal system wish to minimize the realm in which judges are bound by the written law and instead maximize the realm in which written law is subrogated to a variety of indeterminate factors at a judge’s disposal?
—When ambiguity is discerned, ordinary rules of interpretation no longer apply — as the Chief Justice asserts, a court may then “go beyond the plain language of a statute [or contract]” — and judges are accorded broad and arbitrary discretion to pick and choose from among a wide variety of factors as to how the law should be given meaning. Why would any responsible legal system wish to instill in litigants and the public the idea that the personal preferences of a judge, rather than the requirements of the law, are what is most important to the resolution of a legal dispute?
—When ambiguity is discerned, the “judicial power,” the only power properly exercised by a judge under the Constitution, is exercised in a manner incompatible with its usual exercise — as the Chief Justice asserts, a court may then “go beyond the plain language of a statute [or contract].” Why would any responsible legal system wish to depart from traditional constitutional norms or to obscure the Constitution’s separation of powers?
By contrast, what logical or other arguments does the Chief Justice have for substantially expanding the range of judicial decision-making within which courts “may go beyond the plain language of the statute [or contract],” and within which “it is the duty of the courts,” instead of the lawmaker, to give a “reasonable and sensible” interpretation to the law? Ante at 307-308. What conceivable arguments does the Chief Justice have for favoring an expansion in the range of judicial decision-making within which judges are empowered to devise, at their discretion, ad hoc and unpredictable criteria for determining how the law will be defined? Hers is a hollow opinion, evidenced not only *377 by her failure to abide even by her own standards for identifying ambiguity, but also by her failure to articulate even a minimal justification for these standards.[35]
D. LOGIC OF AMBIGUITY RULE
The Chief Justice asserts that language is ambiguous when it is “capable of being understood by reasonably well-informed persons in two or more different senses,” ante at 331, but she never supplies any explanation for how this definition is to operate practically in the real world. She fails to answer, or even ask, whether there is some threshold beyond which it can be said that an interpretation is “capable of being understood by reasonably well-informed persons in two or more different senses.” Is it sufficient, for example, in finding ambiguity that 10% or 20% or 30% of all “reasonably well-informed persons” might subscribe to a particular interpretation? Indeed, is it sufficient that the parties merely disagree, or must the Court intervene to determine that the position of each side is itself reasonable?
Given that the Mayor of Lansing/Klapp standard can be quantified as a 50% test — i.e., if there are two equally reasonable interpretations, a law is ambiguous; otherwise it is not — how would the Chief Justice characterize her standard? What is the approximate threshold at which a law should be found ambiguous? Unless any *378 disagreement by any single “reasonably well-informed personf]” would be sufficient to trigger a finding of ambiguity, where is this threshold point? If 90 percent of all “reasonably well-informed persons” believe that the proper interpretation of a statute is X, and 10 percent believe that it is Y, or if a judge is 90% persuaded that the more reasonable interpretation is X, and 10% persuaded that it is Y, is there ambiguity? Obviously, the Chief Justice’s threshold for finding ambiguity falls somewhere below 50%, but approximately where? Are there any other areas of the law in which a judge, in the exercise of the judge’s fundamental obligation to interpret the law, must subordinate his or her own judgment concerning the meaning of the law to that of “reasonably well-informed [other] persons,” or to any other group of persons?
Given that the Chief Justice’s threshold must necessarily be less than 50%, why should that level ever be deemed sufficient to allow a judge to dispense with the language of a statute or contract as the dispositive factor in determining its meaning? That is, if a judge is 51% or 61% or 71% persuaded that some interpretation of the law is the better, or the “most reasonable,” interpretation, what is the rationale for allowing a judge to interpret the law in some different fashion? Why would a judge ever adopt an interpretation that he or she believes is the second-best, or the second most reasonable, interpretation? If any interpretation of the law, concerning which a judge is less than 100% certain —say a 95% certainty — will ever permit that judge to adopt such interpretation as the better, or the “most reasonable” interpretation, what is the reason why a 51% or 61% or 71% interpretation should not prevail over a 29% or 39% or 49% interpretation — much less with respect to what the Chief Justice describes as “more” interpretations .that might be offered, see ante *379 at 329, none of which may draw their legitimacy from the words of a statute or contract? Why shouldn’t the better, or the “most reasonable,” interpretation always prevail? Absent a perfectly clear statute or contract, why should a judge not prefer the 51% or 61% or 71% interpretation? Why should a 29% or 39% interpretation ever be placed on par with a 71% or 61% interpretation? Indeed, why should a definition of ambiguity be adopted that allows a judge to determine that neither the 75% nor the 25% “most reasonable” interpretations will be adopted? Ante at 328-329. Why isn’t it fair to conclude that the better, or the “most reasonable,” interpretation — which may be the 51% interpretation — is simply the correct interpretation of the law?
The Chief Justice has little interest in parsing § 315(1), little interest in explaining why either of the parties’ interpretations is “reasonable” or “unreasonable,” and little interest in explaining why, in either constitutional or logical terms, her understanding of ambiguity makes sense, much less why it makes better sense than what Mayor of Lansing and Klapp have set forth. Instead, the Chief Justice is content to proceed, without explanation, upon her deconstruction of the law of Michigan.
E. NO PREVIOUSLY ESTABLISHED RULES
After her “analysis” of § 315(1) — one consuming nearly a full paragraph and in which a sideways glance at the sentence immediately preceding the one in dispute is apparently seen as excessively rigorous — the Chief Justice deems the statute “ambiguous,” i.e., alternative interpretations could “reasonably apply.” She then proceeds to select from among the available “interpretative” tools and adopt those that purportedly *380 support her result. Apparently, for every ambiguous statute or contract reaching this Court, and there will be many such statutes and contracts if the Chief Justice’s position ever prevails, she will re-embark upon this “interpretative” process, picking and choosing at her discretion from among some uncertain array of tools lying “beyond the plain language of the statute [or contract].” See Haynes, 477 Mich at 48-49 (MARKMAN, J., concurring), for a partial listing of such tools. The litigants will, of course, have no notice beforehand of which tools are to be employed, for the justices themselves will not know this beforehand. Among the universe of potential tools extending “beyond the plain language of the statute [or contract],” the Chief Justice will, by some means never quite explained, determine which of these are deemed to be relevant in interpreting the statute or contract in that case, and after several turns and twists of the mechanisms of her own internal Enigma machine, some result will emerge. One result will emerge if the “relevant” legislative history, for example, is the Senate committee report, another result will emerge if the “relevant” legislative history is the House committee report. Still other results will emerge if the “relevant” legislative history is comprised of the statements of the Senate or House committee chairman, the floor statements of the Senate or House majority leader, the committee testimony of witness A in the Senate or that of witness B, C, or D in the House, the staff analyses of the House or the Senate, or the floor colloquy of two random members of the House or two other random members of the Senate.[36] All in all, *381 this is a fine process, except that it is not a legal or judicial process. Instead, it is a process in which judges in the very guise of selecting the tools and factors to be employed in “interpreting” the law are effectively its formulators — in short, judges who are wielding the legislative, not the judicial, power.
A critical strength of a judicial philosophy committed to exercising only the constitution’s “judicial power” is that reasonably clear rules of decision-making are established before the fact. That is, a judge essentially promises the parties that he or she will decide their case, as with all others, by attempting to discern the reasonable meaning of relevant statutes or contracts and that this will be done by relying upon recognized rules, and tools, of interpretation. By contrast, under the Chief Justice’s approach to ambiguity, in which there is essentially a limitless array of rules, and tools, that may be employed for “defining” the law apart from its language, there is no consistently applied interpretative process with which the judge promises beforehand to comply. He or she may promise to" be “fair,” and *382 he or she may seek to be fair, but there are no rules for how this fairness is to be achieved. There is only the promise that the judge will address each dispute on a case-by-case basis, using whatever rules, and whichever tools, he or she believes are required in that instance. And the suspicion simply cannot be avoided that these varying and indeterminate rules, and tools, may be largely a function of the outcome preferred by the judge and by his or her personal attitudes toward the parties and their causes. Any interpretative rules will be identified only after the fact, and these “rules” may or may not have been invoked in resolving yesterday’s dispute, and may or may not be employed in resolving tomorrow’s dispute. Any judge can concoct an after-the-fact rationale for a decision; the judicial process, however, is predicated upon before-the-fact rationales. An ad hoc process is not a judicial process at all. In the place of predetermined rules — otherwise understood as the rule of law — the Chief Justice would substitute rules to be determined later.[37]
*383 E CHIEF JUSTICE’S TOOLS IN THIS CASE
What among the universe of available post-ambiguity tools does the Chief Justice choose to consider in reaching her decision here? The Chief Justice states that “caselaw,” among other tools, supports her interpretation of § 315(1). In evaluating this factor, the Chief Justice mainly invokes broad “public policy” considerations. For example, the Chief Justice, citing Harvlie v Jack Post Corp, 2006 Mich ACO 69, emphasizes that the “WCAC has explicitly recognized the importance of holding employers and their insurance carriers responsible for a proration of attorney fees pursuant to § 315(1).” Ante at 332. Yet, in Harvlie, this “importance” was drawn from the following: “The attorney fee provision of Section 315 was designed to promote the assistance of counsel in medical dispute cases where there are minimal or no wage loss benefits from which to obtain an attorney fee.” 2006 ACO 69, at 3 (emphasis added). In essence, Harvlie found that interpreting § 315(l)’s final sentence to require an employer to pay attorney fees made it more likely that an attorney would take a case in which the only recovery available was based on medical costs. Thus, the “importance” of enforcing the majority interpretation is based on this putative “design” even though the reasoning in Harvlie in no way bears this out. The majority interpretation does not obviously “promote the assistance of counsel” because the employee’s attorney recovers the same amount — the contingency fee calculated on the recovered medical expenses — regardless of who pays his fees. See notes 4 and 5 of this opinion. Thus, the supposed “design” set forth in Harvlie is a false one. Nonetheless, the *384 Chief Justice insists that this reasoning somehow sustains her interpretation and supplies better guidance than the actual words of § 315(1).[38]
The Chief Justice next relies on Boyce v Grand Rapids Asphalt Paving Co, 117 Mich App 546, 552; 324 NW2d 28 (1982), in which, after resolving a workers’ compensation attorney fees dispute on the grounds that an administrative rule did not allow an employee to recover fees from a medical provider or employer,[39] the Court proceeded to opine that such a result did not serve “justice.” However, whatever an individual judge’s personal sense of “justice,” it is the responsibility of that judge to do “justice under law.” Judges have no proper authority to countermand the decisions of the lawmaker by substituting a personal sense of “justice” for the justice of the law. I agree that there can be reasonable disagreement as to whether the position asserted by plaintiff or by defendants in this case is more “just.” However, that question has never been thought to be dispositive, or even relevant, in giving meaning to statutes and contracts, and it is not made more dispositive or relevant because it was addressed by the lower court. Many persons, including judges, may have a strong personal sense of “justice” — how public resources should be apportioned, how rights and respon *385 sibilities should be understood, how the limits of government should be defined — but it is “justice under law” that is the tool of the trade of the judge and that defines the judicial power. Moreover, even if ascertaining what constituted abstract “justice” in the instant case did define this Court’s mission, the Chief Justice never even purports to explain why her conception of “justice” — requiring employers to pay employee’s workers’ compensation attorney fees — is somehow superior to alternative conceptions of “justice,” including that of the Legislature, which has chosen to rely upon a different rule than the Chief Justice.[40]
The Chief Justice also relies on the WDCA’s “remedial . . . nature” to support her interpretation. Ante at 332. The WDCA is indeed remedial, because it provides a remedy for employees injured on the job. Yet, the Chief Justice fails to explain why this purpose, as important as it obviously is, should be elevated above every other purpose of the Legislature. The WDCA is the Legislature’s attempt to fulfill at least two pur *386 poses: “to ‘provide ... not only for employees a remedy which is both expeditious and independent of proof of fault, but also for employers a liability which is limited and determinate.’ ” Simkins v Gen Motors Corp (After Remand), 453 Mich 703, 710; 556 NW2d 839 (1996) (citations omitted).[41] By arbitrarily establishing priorities among the several purposes of the WDCA, the Chief Justice undermines the real-world negotiations and compromises that were engaged in by the Legislature. In the place of a statute enacted by a majority of the 148 members of the Legislature, the majority interpretation substitutes a statute approved only by four judges acting well beyond their proper authority.
The Chief Justice then asserts that she is empowered to “construe the act’s terms liberally,” ante at 332— rather than merely “reasonably.” As a result of this process, one essentially indistinguishable from a judge asserting his or her right to place a thumb on the scales of justice, the Chief Justice proclaims that plaintiff is entitled under the WDCA to the greatest possible amount of recovery. Ante at 332. Is there anything more to the Chief Justice’s “liberal” construction than that plaintiff prevails on everything? Is this all that is implied by a “liberal” construction? At what point does the Court decide that its “liberal” construction has fully accomplished the goals of the WDCA? When the employee receives all that he asks for? When an employer can no longer afford to maintain its insurance, or cannot afford to maintain an employee? Does a “liberal” construction militate in favor even of a recovery of benefits that is not contemplated by the actual language *387 of the WDCA? Having declined from the outset to attempt any “reasonable” interpretation of § 315(1), the Chief Justice is far more enthusiastic about proclaiming “ambiguity” and immediately proceeding to a “liberal” interpretation. That is, in the place of an interpretation that is grounded in some meaningful way upon the law itself, the Chief Justice much prefers an “interpretation” that is not really an interpretation at all. She engages in what is merely a political impulse, rather than any serious construction of the law as might once have been expected from a justice of the Supreme Court of this state. Rather than working to achieve the “best” possible or “most reasonable” interpretation of the law, the Chief Justice, apparently fearing that little good would come from such an approach, instead exercises a power that does not belong to judges under the pretext that she is actually engaging in some genuine interpretation of the law, albeit a “liberal” interpretation. While a genuine interpretation of the law is designed to achieve as perfect an understanding as possible of what the lawmaker has intended, a “liberal” interpretation appears here to be little more than a means to achieving a particular result.
In short, the Chief Justice invokes her own understanding of ambiguity for the purpose of providing some justification for her preferred course of “going beyond the plain language of the statute,” and thereby avoiding the difficult process of giving fair meaning to a statute, the fair meaning of which may not be to her liking. “No judge should manufacture ambiguity.” Paige v Sterling Hts, 476 Mich 495, 542; 720 NW2d 219 (2006) (CAVANAGH, J., concurring in part) (emphasis omitted). Yet, there is no longer any need to “manufacture ambiguity” in light of the extraordinarily low threshold by which it can be found under the Chief Justice’s *388 definition. In virtually every instance in which ambiguity is invoked, the Chief Justice would circumvent the actual language of a statute or contract in favor of her own notion of how that statute or contract should be configured.
G. STARE DECISIS
After stating that “stare decisis does not apply” to the Mayor of Lansing standard for determining ambiguity, ante at 314 n 36, the Chief Justice nonetheless devotes almost a third of her opinion to rejecting the stare decisis test in Robinson v Detroit, 462 Mich 439; 613 NW2d 307 (2000), constructing a new test, and then “applying]” it to Mayor of Lansing. It should be emphasized that only one other justice is in agreement.[42] This leads to several reflections concerning the Chief Justice and precedent:
(1) The Chief Justice has repeatedly criticized other justices for “unnecessarily” overruling precedent.[43] What could be less “necessary” than to overturn a case she characterizes as nonbinding precedent? The Chief Justice has also previously stated that a departure from *389 precedent must be supported by some “special justification.”[44] What “special justification” could exist to overrule a case that she does not consider formally binding precedent?[45]
(2) Given that in this case the Chief Justice would expressly overrule, not one, but two of this Court’s prior decisions,
one is naturally tempted to re-inquire, see Rowland v Washtenaw Co Rd Comm, 477 Mich 197, 223-228; 731 NW2d 41 (2007) (MARKMAN, J., concurring), whether the ongoing dispute between the [former] majority and Justice KELLY over overrulings of precedent truly concerns attitudes toward stare decisis or merely attitudes toward particular previous decisions of this Court. [People v Smith, 478 Mich 292, 322-323 n 17; 733 NW2d 351 (2007).]
“A justice’s perspective on stare decisis is not evidenced by her willingness to maintain precedents with which she agrees, but by her willingness to maintain precedents with which she disagrees.” Rowland, 477 Mich at 224-225 n 3 (MARKMAN, J., concurring). Now that the Chief Justice is positioned to overrule decisions with which she disagrees, her actions increasingly demonstrate that her former claims of fealty toward stare decisis were considerably overstated. Despite all her rhetoric concerning the importance of stare decisis for the exercise of the judicial power, see, e.g., her hollow claim that she possessed a “differing [and elevated] *390 esteem for stare decisis” than another justice, People v Gardner, 482 Mich 41, 88 n 31; 753 NW2d 78 (2008), such rhetoric was in reality little more than a means of communicating her opposition to overruling particular past decisions with which she agreed.[46]
(3) As I also asserted in Rowland, 477 Mich at 226:
[N]o meaningful discussion of a court’s attitude toward precedent can be based solely on an arithmetical analysis in which raw numbers of overrulings are simply counted. Such an analysis obscures that not all precedents are built alike, that some are better reasoned than others, that some are grounded in the exercise of discretionary judgments and others in the interpretation of plain language, that some are thorough in their analyses and others superficial.
The chart attached to my concurring opinion in Rowland demonstrates that the former majority’s overrulings of precedent overwhelmingly occurred in cases involving what the then-majority justices viewed as the “misinterpretation of straightforward words and phrases in statutes and contracts, in which words that were not there were read into the law or words that were there were read out of the law.” Id. at 226, 228-247. In contrast, the new majority’s overrulings of precedent has moved toward just the opposite result, replacing decisions that sought to give reasonable *391 meaning to the words of the law with decisions in which “words that were not there were read into the law or words that were there were read out of the law.” That is, when the previous majority overruled a precedent, it was to ensure that the decisions of this Court more closely reflected the judgments of the people’s elected legislative representatives and it was to more closely align case law and statutory law. By contrast, when the new majority has overruled, or at least ignored, a precedent, it has been to create a greater disparity between that case law and the statutory law.
(4) Indeed, since Chief Justice KELLY became a part of the new majority, this majority has dealt with precedents it did not like in an especially inappropriate manner — by simply ignoring them. In the interest of clearing the law of this state of multiple and inconsistent precedents on the same matters of law, the former majority forthrightly and explicitly overruled precedents and never sought to obscure this process or to misleadingly minimize the number of overturned precedents, by either ignoring disfavored precedents or by dubiously “distinguishing” prior case law. Doubtlessly, because it is cognizant of the gap between its past rhetoric extolling the importance of stare decisis and its present actions disregarding stare decisis, the new majority has made an increasingly regular practice of simply ignoring inconvenient precedents.[47] As a result *392 for years to come, the clear rule of law will be stunted in this state as legal practitioners and judges will be able to pick and choose between competing and inconsistent precedents.
(5) The Chief Justice concludes that Robinson’s standard for overruling binding precedent is “insufficiently respectful of precedent” because “not once has the Court cited it as a basis for upholding a prior decision.” Ante at 315-316 (emphasis omitted). The Chief Justice, however, fails to illuminate the reader as to the number of occasions on which she has concluded that binding precedent was wrongly decided and yet joined an opinion maintaining that precedent. Perhaps, this is because the answer is “never.” Not once has the Chief Justice joined an *393 opinion finding a “compelling justification,” or any other basis, for upholding a prior decision that she believed was wrongly decided.[48] More to the point, however, in disparaging the impact of Robinson, the Chief Justice disregards that cases in which Robinson would have been viewed as militating against an overruling of precedent would have been precisely those cases in which there never would have been an opinion issuing from this Court in the first place.[49]
(6) In response to my concurring opinion in Rowland, then-Justice KELLY stated:
Justice MAEKMAN challenges me to develop my “own standards” concerning when I would overturn precedent. But I have no need to create my own standards when well-reasoned standards have been established in the laws of this country for over 150 years. As noted in McDowell [v Oyer], when precedents are “free *394 from absurdity, not mischievous in practice, and consistent with one another,” they should be retained. McDowell, 21 Pa [417, 423 (1853)]. I would not lightly adopt new rules to guide my judicial philosophy when traditional tools used by courts throughout their history continue to serve well. [Rowland, 477 Mich at 255 n 8 (Kelly, J., concurring in part and dissenting in part).]
However, the Chief Justice now apparently finds it necessary to depart from the 150-year-old standard that she has previously hailed to fashion her own new “compelling justification” standard, with its seven evaluative criteria, and we are left to ponder why she no longer views the “free from absurdity, not mischievous in practice, and consistent with another” standard as a sufficient test.[50]
Moreover, it is perplexing why the Chief Justice feels that it is necessary to overrule Robinson and replace it with her new test given the similarity of these standards.[51] Why, to use her own standards, is this “neces *395 saiy” and what is the “compelling justification” for doing this? Indeed, given the Chief Justice’s statements that the “application [of Robinson] has proven superficial and cursory,” ante at 315 (emphasis added), and that Robinson, as previously applied, is “insufficiently respectful of *396 precedent,” ante at 316, one has to wonder whether her real concern is not with the Robinson test itself, but merely with what she views as the misapplication of that test.
V CONCLUSION
I would reverse the Court of Appeals because the final sentence of MCL 418.315(1) does not allow a magistrate to assess an employee’s attorney fees against the employer. Rather, that sentence only allows a magistrate to divide attorney fees among medical providers when the magistrate has ordered direct payment for medical expenses from the employer to those providers.
Corrigan, J, concurred with Markman, J.

 By the “majority interpretation,” I refer only to the result reached by a majority of this Court in the opinions of the Chief Justice (joined by Justice Cavanagh) and Justice Hathaway (joined by Justice Weaver).

 Defendants axe various business entities that were either found to be plaintiffs “employer” for purposes of the WDCA or else liable for those payments as insurers.

 Presumably, if the employee has not paid the reasonable expenses for “medical, surgical, and hospital services,” then the medical providers of those services are the “persons to whom the unpaid expenses may be owing.”

 Under this approach, if the magistrate ordered the employer to pay either the employee or a medical provider $2,000 for unpaid expenses, the magistrate could also order the employer to pay the employee’s attorney fees for the contingency fee on that amount. Assuming a 30% contingency fee, the employer would pay $2,600 total, with $2,000 paid to the employee or medical provider and $600 paid to the employee’s attorney.

 Under this approach, if the magistrate ordered the employer to pay a medical provider $2,000 for unpaid expenses, the magistrate would apportion an amount based on the employee’s contingency fee from that payment to go towards the employee’s attorney fees. Assuming a 30% contingency fee, the employer would pay $2,000, with $600 paid to the employee’s attorney and $1,400 paid to the medical provider.

 “It is only, therefore, within a context that a word, any word, can communicate an idea.” Leach v FDIC, 860 F2d 1266, 1270 (CA 5, 1988).

 This interpretation reflects the common understanding of the term “prorate” as often used, for example, in rental arrangements. A landlord will often “prorate” the tenant’s rent when the lease does not begin on the first of the month. The tenant pays a prorated amount of the monthly rent based on the number of days (out of the whole month) that the tenant will be living in the apartment before the beginning of the next month.

 The Chief Justice asserts that giving the magistrate such standard-less discretion is supported by “[o]ther provisions of the WDCA that vest discretion in magistrates using the word ‘may’... .” Ante at 309 n 19. Contrary to her assertion, however, those other provisions do not similarly vest in a magistrate standardless discretion; rather, they provide at least some specific direction by which the magistrate is to exercise his discretion. With regard to the final sentence of § 315(1), this dissent finds that direction in the penultimate sentence of § 315(1); by contrast, the Chief Justice finds the penultimate sentence to be irrelevant to her analysis.

 Indeed, the Legislature has been fairly consistent throughout the WDCA when it imposes liability against the employer. For example, MCL 418.301(1) states that an employee “shall be paid compensation as provided in this act”; MCL 418.345 states that “the employer shall pay, or cause to be paid, *358 the reasonable expense of the employee’s last sickness, funeral, and burial”; and MCL 418.351(1) states that “the employer shall pay” weekly compensation when the employee is totally incapacitated from work. (Emphasis added.)

 Although the Chief Justice and Justice HATHAWAY purport to “read [§ 315(l)’s final sentence] with the remainder of the statute,” ante at 309 and ante at 342 (Hathaway, J. concurring), both fail to even give consideration to the language in the immediately preceding sentence.

 Recognizing that “not all legislative history is of equal value,” In re Certified Question, 468 Mich 109, 115 n 5; 659 NW2d 597 (2003), this amendment of the statute constitutes the legislative action that established the present relationship between § 315(.l)’s penultimate and final sentences that can be gleaned from the sentences themselves. See supra at 354-355. As such, the fact of this amendment represents what is clearly the most compelling form of legislative history, because it is derived purely from the enacted words of the statute. On the other hand, relying on legislative history based upon a legislative analysis, see, e.g., Adrian School Dist v Michigan Pub School Employees’ Retirement Sys, 458 Mich 326, 335; 582 NW2d 767 (1998) (Kelly, J.); Omne Financial, Inc v Shacks, Inc, 460 Mich 305, 315 n 12; 596 NW2d 591 (1999) (Kelly, J.), created by staff offices within the Legislature is significantly less compelling, In re Certified Question, 468 Mich at 115 n 5, and legislative history that relies exclusively upon the statements of a single one of 110 members of the House of Representatives, or a single one of 38 members of the state Senate, is even less compelling.

 In Haliw v Sterling Hts, 471 Mich 700, 706-707; 691 NW2d 753 (2005), we stated:
Michigan follows the “American rule” with respect to the payment of attorney fees and costs. Under the American rule, attorney fees generally are not recoverable from the losing party as costs in the absence of an exception set forth in a statute or court rule expressly authorizing such an award. [Citation omitted.]

 This is similar to the arrangement provided hy § 821(2), which allows an employee to assign a portion of his workers’ compensation award to an insurance company, health maintenance organization, or medical care and hospital service corporation that makes an advance or payment to the employee under an insurance policy that provides that benefits are not payable for workers’ compensation injuries. Upon enforcement of that assignment, the insurance company, health maintenance organization, or medical care and hospital service corporation shall pay “a portion of the attorney fees of the attorney who secured the worker’s compensation recovery.” MCL 418.821(2). Thus, the employee retains an attorney to recover benefits, and the recovery subject to the assignment helps pay the employee’s attorney fees.
Likewise, pursuant to § 827, a nonparty employer can recover through the efforts of an employee’s attorney pursuing a third-party liability action, whereby an employee can seek recovery for the same damages he “would be entitled to recover in an action in tort.” MCL 418.827(5). If the employee recovers, then he shall first “reimburse the employer or carrier for any amounts paid or payable” under the WDCA, reduced by “expenses of recovery,” id., which include “reasonable expenditures, including attorney fees, incurred in effecting recovery,” MCL 418.827(6). Thus, the employer does not recover the full amount it paid under its workers’ compensation policy. Rather, the full amount is less any attorney fees, which the employer would have had to pay had it sued the third party for recovery as it is entitled to do. MCL 418.827(1) (employer can bring suit against third party in name of employee if one year has passed since the employee’s injury). This reduction of the recovery amount is the same as when a magistrate “prorates” pursuant to § 315(l)’s final sentence.

 The financial outcome for medical providers remains the same, whereas, hy eliminating the need for providers to hire attorneys, the employee actually keeps more of his medical expenses. For example, assume that an employee has paid $3,000 in medical expenses provided *361 for in § 315(1) and still owes a medical provider $2,000 for such expenses. Further assume that attorney fees are 30% of any recovery. Prior to the addition of § 315(l)’s final sentence, an employee would seek recovery of $5,000 from the employer and, upon receiving that amount, would owe his attorney $1,500. After the medical provider commenced an action for the $2,000 and obtained ajudgment for that amount, the employee would be left with $1,500, half of what he paid. The medical provider would owe its attorney $600, meaning that the medical provider recovered $1,400 for its $2,000 bill. Thus, the employee retained $1,500, the medical provider retained $1,400, and the attorneys (employee’s and medical provider’s) went home with $2,100. On the other hand, after the addition of § 315(l)’s final sentence as interpreted in this dissent, the magistrate would direct payment of $2,000 to the medical provider but with $600 appropriated for the employee’s attorney. The magistrate would also direct payment of $3,000 to the employee but with $900 appropriated for the employee’s attorney. As a result, the medical provider recovers the same amount that it would have recovered in a separate action against the employee, but the employee is left with $2,100, which is $600 more than he would have recovered under the old system. The $600 is available because the Legislature provided a way in which recovery could be realized by both the employee and the medical provider without requiring both to hire their own attorneys.

 I also respectfully disagree with Justice Young’s interpretation that § 315(1) “permitís] the magistrate to prorate attorney fees between the claimant and the employer .. ..” Ante at 343. First, he does not account for why the magistrate’s authority to “prorate attorney fees” is only triggered “[w]hen an employer unjustifiably refuses to fulfill its statutory duty to pay for medical expenses ....” Ainte at 344. It would seem more logical under his interpretation that a magistrate could impose attorney fees against an employer any time the employer “fails, neglects, or refuses” to pay for the medical expenses. Nowhere does the statute include the caveat that the refusal must be “unjustified” before the magistrate can “prorate” the fees. Second, the statute directs proration “at the contingent fee rate paid by the employee,” MCL 418.315(1), not *363 “according to the respective merits of [the parties’] positions,” ante at 344. Third, the penultimate sentence “provides two options” — the magistrate can direct payment to the employee or to medical providers — and Justice Young, in my judgment, fails to recognize that these options provide an obvious statutory basis upon which the magistrate can exercise his discretion to “prorate attorney fees.” Finally, although medical providers are, in fact, “entitled to the entirety of their fees” before litigation, ante at 346 n 4, the reality is that a recovery will always be subject to attorney fees. Rather than “impos[ing]” fees against the providers, the Legislature created a mechanism whereby the fees are simply deducted from the recovery being paid to the provider, and whereby the number of “parties to the litigation” can be reduced, without affecting the outcome to those potential parties.

 I note that this approach has not garnered majority support on this Court.

 Because interpreting either statutes or contracts requires a court to give meaning to specific language, the interpretative approach signaled by a particular view of ambiguity “applies with equal force whether the court is interpreting a statutory text or a contractual one.” Mayor of Lansing v Pub Service Comm, 470 Mich 154, 165 n 6; 680 NW2d 840 (2004). See also Ellis v Farm Bureau Ins Co, 482 Mich 1119, 1120-1121 (2008); Zahn v Kroger of Michigan, 483 Mich 34, 40 n 8; 764 NW2d 207 (2009) .

 When deciding a case, the judiciary’s role is, and has always been, to answer the question, “what is the law, and not what ought the law to be.” Detroit v Blackeby, 21 Mich 84, 118 (1870) (Cooley, J., dissenting); see also Michigan United Conservation Clubs v Secretary of State (After Remand), 464 Mich 359, 397; 630 NW2d 297 (2001) (Markman, J., concurring), citing Marbury v Madison, 5 US (1 Cranch) 137; 2 L Ed 60 (1803). “It is for the court to declare what the law is — not to make it.” Wilson v Arnold, 5 Mich 98, 104 (1858).

 The Chief Justice also states that a statute is ambiguous when “two persons reasonably afford [a] different meaning[ ]” to it, or when it is “of questionable or unclear meaning. ” Ante at 328. She has previously opined that a statute is ambiguous “when its application to the facts of the case is uncertain,” DaimlerChrysler Corp v State Tax Comm, 482 Mich 220, 240 n 2; 753 NW2d 605 (2008) (Kelly, J., concurring in the result), or when “there can be reasonable disagreement over its meaning,” Fluor Enterprises, Inc v Dep’t of Treasury, 477 Mich 170, 186; 730 NW2d 722 (2007) (Kelly, J., concurring). As with her latest definition of ambiguity in this case, what would be truly remarkable about any of these definitions would be if they served to exclude many statutory or contractual disputes from their purview. “Uncertainty” and “disagreement” are what draw parties into litigation in the first place. See also Nat’l Pride at Work, Inc v Governor, 481 Mich 56, 95 n 34; 748 NW2d 524 (2008) (Kelly, J., dissenting), in which the Chief Justice asserted that a general provision of Michigan’s constitution was “ambiguous” because it did not expressly set forth every specific circumstance to which it was applicable. The majority responded, “If that were the case, almost all constitutional provisions would be rendered ambiguous.” Id. at 81 n 21.

 Such disagreement between parties is hardly a precedent-shattering event in this Court.

 At least in this regard, she is unquestionably correct. See, for example, the following list of cases enumerated in footnote 56 of the Chief Justice’s opinion to get some sense of the breadth of the matters that she apparently views as “ambiguous” among our published opinions over the past five years alone. With regard to each of these “examples,” the dissenting justices in this case are implicitly chastised for having “declined” to find ambiguity:
See, e.g., Dimmit & Owens Fin, Inc v Deloitte & Touche, 481 Mich 618; 752 NW2d 37 (2008); Ross v Blue Care Network, 480 Mich 153; 747 NW2d 828 (2008); Wesche v Mecosta Co Rd Comm, 480 Mich 75; 746 NW2d 847 (2008); Ernsting v Ave Maria College, 480 Mich 985 (2007); Trentadue [v Buckler Automatic Lawn Sprinkler Co, 479 Mich 378; 738 NW2d 664 (2007)]; Lash v Traverse City, 479 Mich 180; 735 NW2d 628 (2007); Brown [v Detroit Mayor, 478 Mich 589; 734 NW2d 514 (2007)]; Renny v Dep’t of Transportation, 478 Mich 490; 734 NW2d 518 (2007); South Haven v Van Buren Co Bd of Comm’rs, 478 Mich 518; 734 NW2d 533 (2007); Omdahl v West *369 Iron Co Bd of Ed, 478 Mich 423; 733 NW2d 380 (2007); Bukowski v Detroit, 478 Mich 268; 732 NW2d 75 (2007); Karaczewski [v Farbman Stein & Co, 478 Mich 28; 732 NW2d 56 (2007)]; Fluor [Enterprises, Inc v Dep’t of Treasury, 477 Mich 170; 730 NW2d 722 (2007)]; Rowland [v Washtenaw Co Rd Comm, 477 Mich 197; 731 NW2d 41 (2007)]; People v Peals, 476 Mich 636; 720 NW2d 196 (2006); Paige [v Sterling Hts, 476 Mich 495; 720 NW2d 219 (2006)]; Cameron v Auto Club Ins Ass’n, 476 Mich 55; 718 NW2d 784 (2006); Ford Motor Co v Woodhaven, 475 Mich 425; 716 NW2d 247 (2006); People v Derror, 475 Mich 316; 715 NW2d 822 (2006); People v Williams, 475 Mich 245; 716 NW2d 208 (2006); People v Yamat, 475 Mich 49; 714 NW2d 335 (2006); Grimes [v Dep’t of Transportation, 475 Mich 72; 715 NW2d 275 (2006)]; Michigan v Monaco, 474 Mich 48; 710 NW2d 46 (2006); Ostroth v Warren Regency, GP, LLC, 474 Mich 36; 709 NW2d 589 (2006); Co Rd Ass’n v Governor, 474 Mich 11; 705 NW2d 680 (2005); Devillers [v Auto Club Ins Ass’n, 473 Mich 562; 702 NW2d 539 (2005)]; Reed v Yackell, 473 Mich 520; 703 NW2d 1 (2005); Ayar v Foodland Distributors, 472 Mich 713; 698 NW2d 875 (2005); Casco Twp [v Secretary of State, 472 Mich 566; 701 NW2d 102 (2005)]; Elezovic v Ford Motor Co, 472 Mich 408; 697 NW2d 851 (2005); Jarrad v Integon Nat’l Ins Co, 472 Mich 207; 696 NW2d 621 (2005); Roberts v Atkins, 470 Mich 679; 684 NW2d 711 (2004); Neal [v Wilkes, 470 Mich 661; 685 NW2d 648 (2004)]; People v Barbee, 470 Mich 283; 681 NW2d 348 (2004); [People v] Lively, [470 Mich 248; 680 NW2d 878 (2004)]; People v Laney, 470 Mich 267; 680 NW2d 888 (2004); Lansing Mayor [v Pub Service Comm, 470 Mich 154; 680 NW2d 840 (2004)].
It should be clearly understood that in each of these cases, as well as in all other cases in which ambiguity is found, justice under the law would be replaced by the personal “justice” of the men and women who comprise the Court’s majority. This is the “rule of men [and women],” not the rule of law.

 “It is only by interpretations of the law that are in accord with the words of the lawmaker — that is, interpretations in which judges look outside themselves for a source of law — that the decisions of courts are truly removed from the realm of politics and policymaking.” Robertson v DaimlerChrysler Corp, 465 Mich 732, 761; 641 NW2d 567 (2002).

 “Tjjg powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.” Const 1963, art 3, § 2.

 “[I]t is to the words of the statute itself that a citizen first looks for guidance in directing his actions. This is the essence of the rule of law: to know in advance what the rules of society are.” Robinson v Detroit, 462 Mich 439, 467; 613 NW2d 307 (2000).

 In her assertion that this Court “has declined [during a four-year period] to find any statutory language ambiguous,” ante at 311 n 23, the Chief Justice fails to mention that this Court found the contract in Klapp itself to be ambiguous and then resolved this ambiguity by the application of the traditional rule contra proferentem, (resolving a contract dispute against its drafter). See also Stone v Williamson, 482 Mich 144, 157; 753 NW2d 106 (2008). Perhaps more to the point, however, it is odd that the Chief Justice would make a virtue of a judge quickly throwing up his or her hands in the face of even a slightly difficult statute and dispensing with his or her obligation to say what the law means, while making a vice of a judge laboring hard to determine what even a highly difficult statute means in order to ensure that the legislative decisions of the people’s representatives are respected.

 See Koontz v Ameritech Services, Inc, 466 Mich 304, 312; 645 NW2d 34 (2002) (stating that a court “may consult dictionary definitions” to help ascertain the meaning of terms not defined in the statute).

 “It is a cardinal rule in the interpretation of statutes that words which have acquired a well-defined technical meaning, are to be understood in their technical sense ... .” Pitcher v People, 16 Mich 142, 147 (1867); see also MCL 8.3a.

 “ [A] word or phrase is given meaning by its context or setting. ” Tyler v Livonia Pub Schools, 459 Mich 382, 391; 590 NW2d 560 (1999).

 See Sun Valley Foods Co v Ward, 460 Mich 230, 237; 596 NW2d 119 (1999) (stating that “statutory language must be read and understood in its grammatical context”).

 “[I]n the interpretation of the statutes, we are to take into view all such parts as relate to the same subject.” Malonny v Mahar, 1 Mich 26, 28 (1847).

 See Lash v Traverse City, 479 Mich 180, 190; 735 NW2d 628 (2007) (rejecting an argument regarding the statute’s purported purpose as being “completely contrary to the structure of the statute”).

 See, e.g., In re Haley, 476 Mich 180, 198; 720 NW2d 246 (2006) (“[Wjhere a statute contains a specific statutory provision and a related, but more general, provision, the specific one controls.”).

 See Pohutski v City of Allen Park, 465 Mich 675, 694; 641 NW2d 219 (2002) (emphasizing that a crucial aspect to the proper understanding of precedent is that it “should not be applied mechanically to prevent this Court from overruling erroneous decisions regarding the meaning of a statute”).

 The Chief Justice disparages this approach by stating that a “ ‘plain meaning’ approach to statutory interpretation is equally susceptible to subjective and arbitrary determinations of legislative intent” because “such an approach may lead to the selection of one dictionary definition among many for a specific term.” Ante at 313 n 35. The Chief Justice thus damns the very enterprise of judging by suggesting that it can never be anything other than “subjective” and “arbitrary,” for words may sometimes have multiple meanings. The Chief Justice then defends her own approach to the judicial role by effectively declaring that all interpretation is nothing but a fiction in which the judge, one way or another, gets to impose his own personal will. That is, since interpretations of the law can sometimes be difficult, and may entail the application of judgment and discernment, a “plain meaning” approach to interpretation (a characterization incidentally never used by any of the justices dissenting in this case) has no superior stature to a post-ambiguity approach to interpretation in which words are given no respect whatsoever. By equating the imperfections inherent in a human process in which language is taken seriously with the fundamental defects inherent in a *374 process in which language is subordinate to a judge’s personal sense of which results are to be preferred, it is hard to imagine a more mistaken, and cynical, view of the judicial enterprise, albeit one that encapsulates well the persistent constitutional and jurisprudential divide between the justices in the majority and the dissenting justices.
Concerning Liberty Hill Housing Corp v City of Livonia, 480 Mich 44, 57; 746 NW2d 282 (2008), which the Chief Justice cites as somehow exemplifying the defects of the “plain meaning” approach, this Court explained:
The third, fourth, and fifth meanings in the definition are clearly not relevant here. The first meaning defines “occupy” as “to have, hold,. .. possess,... or claim[.]” These parts of the definition are synonymous with ownership. Because the statute uses the conjunctive term “owned and occupied,” however, the Legislature must have intended different meanings for the words “owned” and “occupied.” Otherwise, the word “occupied” would be mere surplusage.
See also id. at 57 n 12. Thus, Liberty Hill relied on the maxim that the Court should avoid rendering a portion of the statute nugatory or surplusage, i.e., the Court should give effect to all the words of the Legislature. Thus, contrary to the Chief Justice’s assertion, Liberty Hill demonstrated that a responsible judge, attempting faithfully to give meaning to the law, does not have “unfettered discretion to pick and choose among available ‘plain meanings,’ ” ante at 321, but rather is bound by existing rules, and by interpretative approaches, that are well-known both to the judge and the parties beforehand. While such an “interpretivist” or “textualist” approach cannot dispense entirely with the exercise of judgment, unlike the approach preferred by the Chief Justice, the interpretative “rules of the game” under the former approach will be known in advance and are designed to reasonably ascertain the intentions of the lawmaker.

 The Chief Justice asserts that she need not justify her standard in light of the fact that other jurisdictions utilize similarly worded standards. Ante at 330-331 & nn 73-75. Whatever the relevance of this observation, one doubts that any of these variants have been applied in other jurisdictions in the wildly overreaching manner reflected by the instant decision, reflected by the breadth of potentially “ambiguous” cases cited at n 21 of this opinion, and reflected in the Chief Justice’s own passion for finding “frequent ambiguity” in the law, Haynes, 477 Mich at 40 (Kelly, J., concurring).

 See, e.g., Nat’l Pride, in which the Chief Justice in her dissent proposed to give meaning to an allegedly “ambiguous” provision of our constitution by assessing the language of campaign brochures by private organizations, statements of the Michigan Civil Rights Commission, the results of a private telephone survey, and a “wealth of extrinsic informa *381 tion available.” Nat’l Pride, 481 Mich at 95-96 (Kelly, J., dissenting). In response, the majority rejected her “apparent proposition that any stray bit of historical flotsam or jetsam can serve as guidance in giving meaning to the constitution.” Id. at 84 n 25. See also Kelly, The fatal weakness in the Michigan Supreme Court majority’s textualist approach to statutory construction, 10 TM Cooley J Prac & Clinical L 287, 309 (2008), in which she describes the dissenting justices’ “distrust” of legislative history, without evidencing any understanding of the basis for this “distrust,” and without recognizing differing attitudes toward different types of legislative history. See, e.g., note 11 of this opinion. It should not go unremarked that in this case, it is the dissent that cites legislative history, albeit a uniquely persuasive and statutorily grounded type of legislative history, as a relevant factor in interpreting § 315(1), while the Chief Justice, the presumed advocate of legislative history, for no apparent reason excludes this from her post-ambiguity toolbox. Why? Apparently because she can choose to consider this factor if she wants to, and she can choose not to consider this factor if she does not want to.

 The arbitrariness of the Chief Justice’s approach can be glimpsed in Haynes, ATI Mich at 45 (Kelly, J., concurring), in which we are instructed that whenever ambiguity arises, a judge may consider another jurisdiction’s statute that is “substantially similar” to the Michigan statute before him or her. “[Foreign] case law interpreting [that jurisdiction’s statute] is instructive with regard to the correct interpretation of our statute.” Id. Yet, shortly thereafter in DaimlerChrysler Corp, 482 Mich at 241 (Kelly, J., concurring in the result), we are instructed by the same judge that, “[g]iven that these cases involve statutes that differ from Michigan’s statutes, I find them of little assistance in determining the proper interpretation of the Michigan statute.” Fair enough; distinctions may be legitimately made in these kinds of things. But where there are 49 other state jurisdictions in the United States, and thousands of other local jurisdictions, and millions of other private contracts entered into in these jurisdictions, it would not seem terribly difficult to identify somewhere and someplace a statute or contract whose interpretation can be invoked in support of an interpretation sought to he obtained in this state. Nor is there any apparent reason why in an appropriate case one of the Chief Justice’s amorphous *383 post-ambiguity tools could not consist of a judicial decision from France, New Guinea, or Azerbaijan. See, generally, Roper v Simmons, 543 US 551; 125 S Ct 1183; 161 L Ed 2d 1 (2005).

 The Chief Justice also cites Harvlie for her “public policy” argument that if employers are not held liable for employees’ attorney fees, employers will “have an incentive to deny medical benefits.” Ante at 332. Yet, she never examines the consequences of the corollary “public policy” wherein employers would he penalized by attorney fees even if they have a valid dispute that the employee did not “receive!] a personal injury arising out of and in the course of employment.” MCL 418.315(1).

 The Court of Appeals cases that followed also adhered to this rale. Duran v Sollitt Constr Co, 135 Mich App 610; 354 NW2d 277 (1984); Zeeland Community Hosp v Vander Wal, 134 Mich App 815; 351 NW2d 853 (1984); Nezdropa v Wayne Co, 152 Mich App 451; 394 NW2d 440 (1986).

 “Thg people have not forfeited lawmaking authority to a judicial aristocracy that may simply rewrite laws with which they disagree.” Karaczewski, 478 Mich at 43. The Chief Justice’s reliance on her own personal brand of “justice” also suffers from the lack of virtue of “overturn[ing] compromises made in the legislative process, second-guessing] judgments of the lawmaker, and rendering] the law increasingly arbitrary and unpredictable.” Rowland, 477 Mich at 226 (Markman, J., concurring). It is also strange that, despite relying upon these post-ambiguity tools of “justice” and “public policy,” neither the Chief Justice nor any other justice even made the slightest effort during oral argument to inquire into anything relevant regarding the “justice” or “public policy” of alternative interpretations of § 315(1), such as the economic impact of competing interpretations upon the health and competitiveness of Michigan’s businesses, or the impact of competing interpretations upon workers’ compensation insurance premiums. One might have thought such inquiries to be a useful precondition to judicial decisions predicated upon “justice” and “public policy.”

 Most workers’ compensation statutes “represento a compromise between the competing interests of disabled laborers and their employers.” Potomac Electric Power Co v Office of Workers' Compensation Programs Director, 449 US 268, 282; 101 S Ct 509; 66 L Ed 2d 446 (1980).

 Although the Chief Justice applies her newly formulated “compelling justification” standard to conclude that Mayor of Lansing should be overruled, she neglects even to apply her new stare decisis standard to determine whether Robinson itself should be overruled. In this regard, see also note 47 of this opinion.

 See, for example, People v Smith, 478 Mich 292, 331; 733 NW2d 351 (2007) (Kelly, J., dissenting); Rowland, 477 Mich at 248 (Kelly, J., concurring in part and dissenting in part); Joliet v Pitoniak, 475 Mich 30, 46; 715 NW2d 60 (2006) (Kelly, J., dissenting); Rory v Continental Ins Co, 473 Mich 457, 492; 703 NW2d 23 (2005) (Kelly, J., dissenting); People v Hickman, 470 Mich 602, 618; 684 NW2d 267 (2004) (Kelly, J., dissenting); People v Kazmierczak, 461 Mich 411, 427; 605 NW2d 667 (2000); (Kelly, J., concurring in part and dissenting in part); Mudel v Great Atlantic & Pacific Tea Co, 462 Mich 691, 749; 614 NW2d 607 (2000) (Kelly, J., concurring in part and dissenting in part).’

 See, for example, People v Gardner, 482 Mich 41, 85; 753 NW2d 78 (2008) (Kelly, J., dissenting); Rowland, 477 Mich at 254 (Kelly, J., concurring in part and dissenting in part); People v Davis, 472 Mich 156, 189; 695 NW2d 45 (2005) (Kelly, J., dissenting); Hickman, 470 Mich at 616 (Kelly, J., dissenting); Robinson, 462 Mich at 476 (Kelly, J., concurring in part and dissenting in part).

 Contrary to the Chief Justice’s assertion, ante at 326 n 63, nowhere in this opinion is it stated that a standard for ambiguity is or is not “entitled to stare decisis” consideration.

 The Chief Justice also stated in Gardner, 482 Mich at 87, that “stare decisis requires that we give those [earlier] decisions thoughtful and thorough consideration before tossing them aside.” See also Rowland, 477 Mich at 256 (“The law has not changed. Only the individuals wearing the robes have changed. It is amazing how often the members of this majority have declared themselves more capable of understanding the law and reaching the “right” result than any justice who sat before.”) (Kelly, J., concurring in part and dissenting in part); Davis, 472 Mich at 190 (overruling multiple cases “destabilizes our state’s jurisprudence. It suggests to the public that the law is at the whim of whoever is sitting on the Supreme Court bench. Surely, it erodes the public’s confidence in our judicial system.”).

 See, e.g., Vanslembrouck v Halperin, 483 Mich 965 (2009), an order entered in which the new majority ignored Vega v Lakeland Hosps, 479 Mich 243; 736 NW2d 561 (2007); Hardacre v Saginaw Vascular Services, 483 Mich 918 (2009), an order in which it failed to follow Boodt v Borgess Med Ctr, 481 Mich 558; 751 NW2d 44 (2008); Sazima v Shepherd Bar & Restaurant, 483 Mich 924 (2009), an order in which it failed to follow Chrysler v Blue Arrow Transport Lines, 295 Mich 606; 295 NW 331 (1940), and Camburn v Northwest School Dist (After Remand), 459 Mich 471; 592 NW2d 46 (1999); Juarez v Holbrook, 483 Mich 970 (2009), an order in which it failed to follow Smith v Khouri, 481 Mich 519; 751 *392 NW2d 472 (2008); Beasley v Michigan, 483 Mich 1025 (2009), an order in which it failed to follow Rowland; Scott v State Farm Mut Automobile Ins Co, 483 Mich 1032 (2009), an order in which it failed to enforce Thornton v Allstate Ins Co, 425 Mich 643; 391 NW2d 320 (1986), and Putkamer v Transamerica Ins Corp of America, 454 Mich 626; 563 NW2d 683 (1997); Chambers v Wayne Co Airport Auth, 483 Mich 1081 (2009), an order in which it again failed to abide by Rowland; and Bush v Shabahang, 484 Mich 156; 772 NW2d 272 (2009), in which it ignored Roberts v Mecosta Co Gen Hosp (After Remand), 470 Mich 679; 684 NW2d 711 (2004) (Roberts II).
In addition to ignoring precedents altogether, see Potter v McLeary, 484 Mich 397; 774 NW2d 1 (2009), in which the new majority avoided overruling Roberts II, for an illustration of a seriously dubious “distinguishing” of precedent. Such treatment of inconvenient precedents, reflected also in the Chief Justice’s “comprehensive response” to these charges, ante at 326 n 63, which cites Potter, 484 Mich at 426-429 (Kelly, C.J., concurring), may well reduce the number of occasions on which precedents have been explicitly overruled, but they do nothing to uphold the values of stare decisis, which would seem to be the whole purpose of the exercise, while allowing multiple and inconsistent precedents to define the law of this state. In the end, there is no shortcut to resolving whether the new majority or the dissenting justices are correct in their characterizations of what the majority is doing. We can only identify what we believe to be the questionable decisions of the majority, identify the relevant precedents, and invite the reader to reach his or her own conclusions.

 The Chief Justice responds that she has not upheld what she viewed as a wrongly decided precedent under the “compelling justification” standard because that “has never been the standard in Michigan during [her] years as a justice.” Ante at 326-327 n 63. However, the point is that, even under her own similar “special justification” standard, see, e.g., Gardner, 482 Mich at 85 (Kelly, J., dissenting), or under any other standard, the Chief Justice has never joined an opinion to uphold what she viewed as a wrongly decided precedent. Her application of her “special justification” standard also belies her claim that she “followed Robinson in subsequent cases.” Ante at 327 n 63.

 The Chief Justice also neglects to mention that Robinson, 462 Mich at 466 n 26, expressly identified two illustrative cases it likely would not have overruled even if it believed they had been wrongly decided: Massey v Secretary of State, 457 Mich 410; 579 NW2d 862 (1998), the case upholding term limits, and Advisory Opinion re Constitutionality of 1972 PA 294, 389 Mich 441; 208 NW2d 469 (1973), this Court’s initial advisory opinion with regard to automobile no-fault insurance. See also People v Lively, 470 Mich 248, 259; 680 NW2d 878 (2004) (Maekman, J., concurring) (finding it unnecessary to determine whether longstanding precedent should be overruled under Robinson standards); People v Starks, 473 Mich 227, 237; 701 NW2d 136 (2005) (Markman, J., joining concurring opinion stating it was unnecessary to overrule a prior case).

 It also should not be lost on the reader that these criteria are nothing more than a hodgepodge thrown together without any prior case law in support. Given her criticism that the test for ambiguity set forth in Mayor of Lansing was made up out of “thin air,” ante at 311, one might think the Chief Justice would be especially careful to identify at least one or two courts that have utilized her own new criteria.

 Under the Chief Justice’s standard, stare decisis analysis “begin[s] with the presumption that upholding the precedent involved is the preferred course of action.” Ante at 317. Under Robinson, “[s]tare decisis is generally ‘the preferred course.’ ” Robinson, 462 Mich at 463 (citation omitted). Under the Chief Justice’s standard, we are to consider whether the precedent “has proven to he intolerable because it defies practical workability!.]” Ante at 320. Under Robinson, we considered “whether the precedent “defies ‘practical workability.’ ” Robinson, 462 Mich at 464. Under the Chief Justice’s standard, a court is to consider “whether reliance on the [precedent] is such that overruling it would cause a special hardship and inequity!.]” Ante at 320. Under Robinson, we considered “whether reliance interests would work an undue hardship.” Robinson, 462 Mich at 464. Under the Chief Justice’s standard, we are to consider “whether related principles of law have so far developed since *395 the rule was pronounced that no more than a remnant of the rule has survived!.]” Ante at 320. Under Robinson, we considered “whether changes in the law ... no longer justify the questioned decision.” Robinson, 462 Mich at 464. Under the Chief Justice’s standard, we are to consider “whether facts and circumstances have so changed, or come to be seen so differently, as to have robbed the old rule of significant application or justification!.]” Ante at 320. Under Robinson, we considered “whether changes in the ... facts no longer justify the questioned decision.” Robinson, 462 Mich at 464. Under the Chief Justice’s standard, we are to consider “whether other jurisdictions have decided similar issues in a different manner!.]” Ante at 320. Under Robinson, we considered both the “practical workability” of the questioned decision and “changes in the law,” under which decisions from other jurisdictions could be used to address each factor. Robinson, 462 Mich at 464. Under the Chief Justice’s standard, we are to consider “whether upholding the rule is likely to result in serious detriment prejudicial to public interests!.]” Ante at 320. Under Robinson, we considered both the “practical workability” of the questioned decision and “changes in the law or facts that no longer justify the questioned decision,” Robinson, 462 Mich at 464, and each of these factors gave consideration, in the Chief Justice’s language, to “whether upholding the rule is likely to result in serious detriment prejudicial to public interests!.]” Ante at 320.
The final factor in the Chief Justice’s new test — “whether the prior decision was an abrupt and largely unexplained departure from precedent,” ante at 320 — ignores two aspects of this Court’s former approach to stare decisis. First, by establishing a “lower level of deference” for cases that themselves have overruled precedent, the Chief Justice disregards that the particular precedents she so disfavors themselves often overruled decisions that “departfed] from precedent.” Ante at 317-318. See the chart in Rowland, 477 Mich at 228-247 (Markman, J., concurring), for a list of such decisions. Does the Chief Justice take this into account in her calculus? Second, I can only invite those interested in the workings of their judiciary to read the decisions of this Court in which the former majority overruled precedent, see id. at 223, and compare these with the decisions in which the new majority has now overruled or ignored precedent, see note 47 of this opinion, and assess which of these have been most “unexplained” or “abrupt.”